M. GREGG BLOCHE and          :
JONATHAN H. MARKS,          :
         :
    Plaintiffs,          :     Civil Action No.:     07-2050 (RC)
         :
    v.          :     Re Document Nos.:     96, 97, 110
         :
DEPARTMENT OF DEFENSE, *et al.*,          :
         :
    Defendants.          :

## <u>MEMORANDUM OPINION</u>

**GRANTING IN PART AND DENYING IN PART DEFENDANTS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

This suit arising under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, began in 2007, when Plaintiffs M. Gregg Bloche and Jonathan H. Marks sought records from multiple federal government entities concerning the involvement of medical professionals in designing and implementing interrogation tactics. Presently before the Court are two sets of motions. First, three Defendant agencies, (1) the Department of the Navy ("Navy"); (2) the Office of the Assistant Secretary of Defense for Health Affairs ("OASD-HA Policy"); and (3) the Department of Defense's Office of the Deputy General Counsel for Personnel and Health Policy ("OASD-HAGC"), renew their motion for summary judgment.[1] *See* ECF No. 110. For the reasons set forth below, the Court grants in part and denies in part this motion.

---

[1] These Defendants filed a renewed motion for summary judgment along with supplementary documentation to address deficiencies identified in the Court's prior memorandum opinion concerning this set of records. *See Bloche v. Dep't of Def.* ("*Bloche II*"),

Second, separately before the Court are cross-motions for summary judgment concerning

six other Defendant agencies: (1) the United States Army ("Army"); (2) the Office of the

Director of National Intelligence ("ODNI");[2] (3) the United States Special Operation Command

("SOCOM"); (4) the Defense Intelligence Agency ("DIA"); (5) the United States Central

Command ("CENTCOM"); and (6) the Joint Task Force Guantanamo ("JTF-GTMO").[3] *See*

ECF Nos. 96, 97.[4] Each of these Defendant agencies conducted its own search in response to

Plaintiffs' FOIA requests, and the adequacy of Defendants' searches are not at issue.[5] What is at

---

370 F. Supp. 3d 40 (2019). As noted therein, OASD-HA Policy and OASD-HAGC are components of a named Defendant, the Department of Defense ("DOD"), and are not formally Defendants in this suit. *Id.* at 48 n. 1. For consistency and clarity, the Court identifies the parties in the same manner and will occasionally refer to these DOD components as Defendants in this opinion. The Court refers to the March 2019 opinion as *Bloche II* to distinguish it from a 2017 opinion in this same suit that concerned Defendant Navy. *See Bloche v. Dep't of Def.* ("*Bloche I*"), 279 F. Supp. 3d 68 (2017).

[2] While the instant cross-motions were ripening, Defendant ODNI resolved Plaintiffs' challenges concerning both the documents that it had produced and the documents that it had referred to the State Department. *See* Pls.' Mem. P. & A. Supporting Cross-Mot. for Partial Summ. J. ("Pls.' Mem.") 7, ECF No. 97-1 (discussing further releases by State Department); *id.* at 8 n.2 (noting that Plaintiffs no longer challenge two ODNI-associated documents); Pls.' Reply Supporting Cross-Mot. ("Pls.' Reply") Ex. 1, Updated History of Disputed Docs. 7, ECF No. 101-1 (documenting that Plaintiffs do not dispute the documents referred to State or any other documents produced by ODNI). Thus, the remainder of this opinion will not discuss Defendant ODNI or the State Department.

[3] JTF-GTMO, CENTCOM, and SOCOM are components of DOD and are not, formally speaking, Defendants in this suit. The Court will nonetheless refer to these components as Defendants to address the records at issue with greater particularity.

[4] ECF number 97 is substantively identical to ECF number 98, although 97 is labelled a cross-motion for partial summary judgment, whereas 98 is styled as Plaintiffs' memorandum in opposition to Defendants' motion for partial summary judgment and lacks one of the attachments. The Court refers exclusively to ECF number 97 in this opinion. Along similar lines, ECF number 99 is substantively identical to ECF number 100, although 99 is labelled as Defendants' memorandum in opposition to Plaintiffs' cross-motion and 100 is styled as a reply to Plaintiffs' opposition and lacks two attachments. The Court refers exclusively to ECF number 99 in this opinion.

[5] Plaintiffs do not challenge the adequacy of the search at all, with one exception: Plaintiffs' reply brief contends that Defendant Army has not performed an adequate search for four missing documents: Army 25, Army 26, Army 112, and Army 113. *See* Pls.' Reply 2.

issue in these cross-motions is the application of FOIA exemptions to withhold in full or in part the documents produced by the agencies. For reasons that the Court will detail below after addressing Defendants' renewed motion for summary judgment, *see* ECF No. 110, the Defendant agencies involved in the pending cross-motions for summary judgment, *see* ECF Nos. 96, 97, have provided adequate justification for some, but not all of their claimed exemptions. The Court thus grants in part and denies in part Defendants' motion for partial summary judgment and denies Plaintiffs' cross-motion for partial summary judgment.

## II. LEGAL STANDARD

Congress enacted FOIA to permit citizens to discover "what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (quoting *EPA v. Mink*, 410 U.S. 73, 105 (1973) (Douglas, J. dissenting)). FOIA requires the agency to disclose records located in response to a valid FOIA request, unless material in the records falls within one of FOIA's nine statutory exemptions. 5 U.S.C. § 552(b); *see also Judicial Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 738 (D.C. Cir. 2017); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975).

---

Plaintiffs' memorandum in support of their cross-motion for partial summary judgment included a single line in a footnote that purportedly "reserve[d] [the] right to object to Defendants' alleged 'thorough and exhaustive search' for unredacted versions" of these documents. Pls.' Mem. 25 n.5. Plaintiffs' reply brief then developed this objection for the first time. Courts in this Circuit have "generally held that issues not raised until the reply brief are waived." *Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1181 (D.C. Cir. 2000) (quoting *Board of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (1996)); *see also Walker v. Pharm. Research & Mfrs. of Am.*, 461 F. Supp. 2d 52, 59 (D.D.C. 2006) (citing *In re Asemani*, 455 F.3d 296, 300 (D.C. Cir. 2006)). This principle holds when a party does not argue a point until its reply brief, even if the party referred to the argument in its opening brief. *Sitka Sound Seafoods, Inc.*, 206 F.3d at 1181. Here, by failing to contest the adequacy of Army's search until its reply brief, Plaintiffs waived this argument. Thus, the Court addresses only the application of FOIA exemptions by each of the Defendant agencies.

"FOIA cases typically and appropriately are decided on motions for summary judgment."

*Pinson v. U.S. Dep't of Justice*, 236 F. Supp. 3d 338, 352 (D.D.C. 2017) (quoting *Defs. of*

*Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)).  In general, summary

judgment is appropriate when "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

"material" fact is one capable of affecting the substantive outcome of the litigation.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is

enough evidence for a reasonable factfinder to return a verdict for the non-movant.  *See Scott v.*

*Harris*, 550 U.S. 372, 380 (2007).  In a FOIA suit, "summary judgment is appropriate if there are

no material facts genuinely in dispute and the agency demonstrates 'that its search for responsive

records was adequate, that any exemptions claimed actually apply, and that any reasonably

segregable non-exempt parts of records have been disclosed after redaction of exempt

information.'"  *Prop. of the People, Inc. v. Office of Mgmt. and Budget*, 330 F. Supp. 3d 373, 380

(D.D.C. 2018) (quoting *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C.

2017)).

      A court addressing a motion for summary judgment in a FOIA suit is to review the matter

*de novo*.  *See* 5 U.S.C. § 552(a)(4)(B); *Life Extension Found., Inc. v. Internal Revenue Serv.*, 915

F. Supp. 2d 174, 179 (D.D.C. 2013).  The reviewing court may grant summary judgment based

on the record and agency declarations if "the agency's supporting declarations and exhibits

describe the requested documents and 'the justifications for nondisclosure with reasonably

specific detail, demonstrate that the information withheld logically falls within the claimed

exemption, and are not controverted by either contrary evidence in the record nor by evidence of

agency bad faith.'"  *Pronin v. Fed. Bureau of Prisons*, No. CV 17-1807, 2019 WL 1003598, at

*3 (D.D.C. Mar. 1, 2019) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal citation omitted)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Scudder v. Cent. Intelligence Agency*, 254 F. Supp. 3d 135, 140 (D.D.C. 2017) (quoting *Judicial Watch*, 715 F.3d at 941 (internal citations omitted)). But exemptions are to be "narrowly construed." *Bloche II*, 370 F. Supp. 3d at 50 (quoting *Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1115 (D.C. Cir. 2007)). An agency cannot justify its withholding by providing "[c]onclusory and generalized allegations of exemptions," *Morley*, 508 F.3d at 1114–15 (internal citations omitted), and an agency must do more than provide "summary statements that merely reiterate legal standards or present 'far-ranging category definitions for information,'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 13 (D.D.C 2013) (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 221 (D.C. Cir. 1987)).

## III. DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

The sole issue in Defendants' renewed motion for summary judgment, as noted previously, is Defendants' application of FOIA exemptions. This Court's March 2019 memorandum opinion and order denied summary judgment with respect to nine documents, directing Defendants both to produce these documents for *in camera* review and to provide supplementary justification. The majority of these documents were withheld in full or in part pursuant to Exemption 5's deliberative process privilege,[6] *see* 5 U.S.C. § 552(b)(2), and two

---

[6] The seven documents originally withheld pursuant to Exemption 5 are OASD-HA Policy 28-35, 659, 758-59, 761-62, 765-66, and OASD-HAGC 272 and 563-68. *See Bloche II*, 370 F. Supp. 3d at 54–55. After the Court's March 2019 memorandum opinion, OASD-HAGC determined that OASD-HAGC 272 and 563-68 could be released with only the names of personnel redacted, pursuant to Exemption 6, and produced these documents to Plaintiffs. Defs.' Mem. P. & A. Supporting Renewed Mot. Partial Summ. J. ("Defs.' Mem. P. & A. Supporting Renewed Mot.") 4, ECF No. 110-1 (citing Ex. C, Second Declaration of Mark H. Herrington

were withheld pursuant to Exemption 7(E), which permits an agency to withhold information

related to "techniques and procedures for law enforcement investigations and prosecutions," *id.* §

552(b)(7).[7]  The Court will address each of these exemptions (deliberative process privilege for

Defendant OASD-HA and 7(E) for Defendant Navy) in turn.  Because it finds that Defendant

OASD-HA has justified its invocation of FOIA Exemption 5 for all but one of its withheld

documents and that Defendant Navy has justified its invocation of FOIA Exemption 7(E) for

both of its partially withheld documents, the Court will grant in part and deny in part

Defendants' renewed motion for summary judgment.

### A. Defendant OASD-HA Policy

1. Exemption 5 – The Deliberative Process Privilege

Exemption 5 of FOIA protects "inter-agency or intra-agency memorandums or letters that

would not be available by law to a party other than an agency in litigation with the agency."  5

U.S.C. § 552(b)(5).  The Supreme Court and the D.C. Circuit have construed Exemption 5 to

exempt documents "normally privileged in the civil discovery context."  *Sears*, 421 U.S. at 149;

*see also Martin v. Office of Special Counsel*, 819 F.2d 1181, 1184 (D.C. Cir. 1987).  Exemption

5 thus "incorporates the traditional privileges that the Government could assert in civil litigation

against a private litigant"—including, as relevant here, "the deliberative process privilege."

*Brown v. Dep't of State*, 317 F. Supp. 3d 370, 375 (D.D.C. 2018) (quoting *Loving v. Dep't of*

---

("Second Herrington Decl.") ¶¶ 6–7, ECF No. 110-3).  Thus, the sole documents for which
Plaintiffs continue to challenge Defendants' Exemption 5 withholdings are OASD-HA Policy
28-35, 659, 758-59, 761-62, and 765-66.

[7] The Court also directed the OASD Defendants to reconsider the application of
Exemption 6 to redact the domain portion of agency email addresses.  *See Bloche II*, 370 F.
Supp. 3d at 58–59.  The parties reached agreement on this issue and filed a motion to amend this
order, *see* ECF No. 108, which this Court granted on April 29, 2019, *see* ECF No. 111.
Exemption 6 is, accordingly, no longer at issue in this suit.

*Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (internal quotation mark and citation omitted)); *see also Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006).

The deliberative process privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Loving*, 550 F.3d at 38 (quoting *U.S. Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)). It aims to "prevent injury to the quality of agency decisions," *Sears*, 421 U.S. at 151, and "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," *Klamath Water Users Protective Ass'n*, 532 U.S. at 8–9. The privilege thus balances the merits of transparency against the concern that agencies will be "forced to operate in a fishbowl." *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).

For the deliberative process privilege to apply, the record must "bear on the formulation or exercise of agency policy-oriented *judgment*." *Petroleum Info. Corp.*, 976 F.2d at 1435 (emphasis in original). To qualify, the record at issue must be both predecisional and deliberative. *See Prop. of the People*, 330 F. Supp. 3d at 382. To be predecisional, a record must be antecedent to the adoption of an agency policy. *See Access Reports v. U.S. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). Although "the term 'deliberative' does not add a great deal of substance to the term 'pre-decisional,'" it essentially means "that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue." *Nat'l Sec. Archive v. Cent. Intelligence Agency*, 752 F.3d 460, 463 (D.C. Cir. 2014).

Moreover, the agency bears the burden of showing that the privilege properly applies.

*See Dillon v. U.S. Dep't of Justice*, No. 17-1716, 2019 WL 249580, at *8 (D.D.C. Jan 17, 2019)

(citing *Prop. of the People*, 330 F. Supp. 3d at 380). In order to meet its burden, the agency must

offer a "relatively detailed justification" of its application of the privilege. *Elec. Privacy Info.*

*Ctr. v. U.S. Drug Enf't Agency*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data*

*Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)). "An agency may

rely on detailed affidavits, declarations, a *Vaughn* index, in camera review, or a combination of

these tools." *Elec. Frontier Found. v. U.S. Dep't of Justice*, 57 F. Supp. 3d 54, 59 (D.D.C. 2014)

(quoting *Comptel v. Fed. Commc'n Comm'n*, 910 F. Supp. 2d 100, 111 (D.D.C. 2012)).

"Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears

logical or plausible." *Dillon*, 2019 WL 249580, at *8 (quoting *Wolf v. Cent. Intelligence Agency*,

473 F.3d 370, 374–75 (D.C. Cir. 2007) (internal quotation marks and citation omitted)).

2. Defendant's Claims of Deliberative Process Privilege

At issue here are five documents, OASD-HA Policy 28-35, 659, 758-59, 761-62, and

765-66, for which Defendant OASD-HA Policy did not previously provide "sufficiently detailed

justifications" for its application of FOIA exemptions. *Bloche II*, 370 F. Supp. 3d at 53. As this

Court previously explained, the contested documents fall into two categories: first, agency policy

documents and associated discussions and, second, possible communications with outside

entities. *Id.* at 51. "[B]oth of these categories of documents fall within the scope of the

deliberative process privilege—as long as each particular privilege claim is properly supported

by the 'relatively detailed justification' that FOIA requires." *Id.* (quoting *Mead Data Cent., Inc.*,

566 F.2d at 251). For the following reasons, OASD-HA Policy has now adequately justified its

privilege claim for almost all of the challenged OASD-HA Policy documents, but it has not established that the privilege properly applies to OASD HA Policy 28-35.

### a. OASD HA Policy 28-35

OASD HA Policy 28-35 is an email chain from 2008 along with an attached information memo ("info memo") discussing proposed amendments to DOD detainee healthcare policies. Second Herrington Decl. ¶ 8; *see also* Defs.' Mem. P. & A. Supporting Renewed Mot. 12–13. The info memo discusses proposed amendments to DoDI 2310.08E and 2310.01E that were offered by a representative from the group Physicians for Human Rights ("PHR"). Second Herrington Decl. ¶ 8. PHR's specific proposed text is appended to the info memo produced by the agency. *Id.* PHR submitted this material in response to the Assistant Secretary of Defense for Health Affair's ("ASD(HA)'s") desire for input regarding a potential amendment to these policies. *Id.* Exemption 5 was not applied to the email chain, but the attached info memo and proposed amendments offered by PHR are withheld in full under Exemption 5's deliberative process privilege. *Id.* Defendants justify this withholding as authorized by the "consultant corollary" exception to Exemption 5's general rule that a record must be an "interagency or intra-agency communication," 5 U.S.C. § 552(b)(5), to qualify as privileged. Defs.' Mem. P. & A. Supporting Renewed Mot. 13–14. Under the consultant corollary, "records of communications between an agency and outside consultants qualify as 'intra-agency' for purposes of Exemption 5 if they have been 'created for the purpose of aiding the *agency's* deliberative process.'" *100Reporters LLC v. U.S. Dep't of Justice*, 248 F. Supp. 3d 115, 146 (D.D.C. 2017) (quoting *Pub. Citizen v. U.S. Dep't of Justice*, 111 F.3d 168, 170 (D.C. Cir. 1997) (emphasis in original)); *see also Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 201 (D.C. Cir. 2014) ("This Court has

also interpreted the phrase 'intra-agency' in Exemption 5 to go beyond the text and include U.S. agency records authored by non-agency entities if those records were solicited by a U.S. agency in the course of its deliberative process." (citing *McKinley v. Bd. of Governors of the Fed. Reserve Sys.,* 647 F.3d 331, 336 (D.C. Cir. 2011)). Defendants offer that this is just such a communication: "PHR's proposed amendments and the subsequent 'info memo' summarizing PHR's proposals were created to aid the ASD(HA)'s deliberations regarding possible amendment of the detainee healthcare policies and not to solicit a benefit at the expense of a competitor." Defs.' Mem. P. & A. Supporting Renewed Mot. 14.

In challenging this withholding, Plaintiffs primarily contest the vagueness of OASD-HA Policy's description of the document and the attachments. *See, e.g.*, Pls.' Mem. P. & A. Opp'n Defs.' Renewed Mot. Partial Summ. J. ("Pls.' Mem. P. & A. Opp'n") 15 ("Even if one assumes (as Defendants imply but do not make clear) that the attached memo to the email chain contains not just PHR recommendations but comments by DoD personnel on the amendments, Defendants still have not explained how disclosure would inhibit full and frank exchange of views."). Plaintiffs also suggest that this communication was not predecisional because the policies were issued in 2006, yet the dialogue regarding proposed amendments occurred in 2008, such that the document was not "generated before the adoption of an agency policy" in the way that the deliberative process privilege requires. Pls.' Mem. P. & A. Opp'n 14 (quoting *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980)).

Neither party's argument is entirely persuasive. In contesting the predecisional status of the document, Plaintiffs misconstrue the relevant policymaking timeline. Here, as Defendants note, the policy deliberations concerned *whether* to amend the policy in 2008. An agency may deliberate about potential changes to a policy before concluding that there should be no

amendment, and the privilege may still apply so long as the agency establishes the role that the documents at issue played in the *deliberative process*. *Accord Nat'l Sec. Archive v. Cent. Intelligence Agency*, 752 F.3d 460, 463 (D.C. Cir. 2014) ("There may be no final agency document because a draft died on the vine. But the draft is still a draft and thus still pre-decisional and deliberative."). Because OASD-HA Policy's supplemental declaration specifies how opinions were generated in deliberation about a specific policy proposal that predated a final policy determination, it establishes that the document was part of a policy-oriented decisionmaking process in the manner required to invoke Exemption 5.

That said, without more clarity about PHR's relationship to the agency in generating the material, this Court cannot determine the propriety of applying the deliberative process privilege—which, again, only applies to "inter-agency or intra-agency" documents. 5 U.S.C. § 552(b)(5). The problem is that OASD-HA Policy has not provided enough explanation about its relationship with PHR, a non-agency actor, for the Court to assess whether OASD-HA Policy may properly rely on the "consultant corollary" exception to Exemption 5. It is true, as Defendants point out, that the involvement of an entity outside of the agency in generating a document does not necessarily bar the application of the privilege. *See* Defs.' Mem. P. & A. Supporting Renewed Mot. 14. But there are limitations on when an agency can rely on this exception. Critically, an agency can invoke the consultant corollary only if the "outside consultant did not have its own interests in mind." *Pub. Emps. for Envtl. Responsibility*, 740 F.3d at 201–02. Here, the agency received PHR's proposal after the ASD(HA) "asked his staff to meet with th[e] [PHR] representative to get their views for his consideration." Second Herrington Decl. ¶ 8. Without more detail that OASD-HA Policy fails to provide, this statement does not discharge OASD-HA Policy's burden to establish that the PHR "consultant function[ed]

just as an [agency] employee would be expected to do"—and not as an advocate representing "an interest of its own, or the interests or any other client, when it advise[d] the agency." *McKinley*, 647 F.3d at 336 (quoting *Klamath Water Users Protective Ass'n*, 532 U.S. at 12). In fact, Plaintiffs characterize PHR's recommendations not as a neutral proposal, but rather as a "proposal from a human rights group," Pls.' Mem. P. & A. Opp'n 15, that would ostensibly represent its own interests in providing such a proposal. In some respects, the relationship sounds more like an interested advocacy group commenting on a proposed agency policy (as happens routinely during proposed rulemaking) than it does an agency consultant providing internal advice. Thus, until the agency clarifies the context in which PHR was asked to provide this information and the relationship between the organization and the agency in the delivery of advice, Defendants' justification is insufficient to demonstrate "that any exemptions claimed actually apply." *Prop. of the People, Inc.*, 330 F. Supp. 3d at 380 (quoting *Competitive Enter. Inst.*, 232 F. Supp. 3d at 181).

### b. OASD-HA Policy 659

OASD 659 is an undated single page of handwritten notes by an unknown author that was located alongside a draft investigation report with the title, "Medical Issues Relevant to Interrogation and Detention Operations." Second Herrington Decl. ¶ 9. The agency withheld the draft investigation report, OASD-HA Policy 660-690, in full under Exemption 5, and this Court previously found the draft to be privileged. *Id.*; *see Bloche II*, 370 F. Supp. 3d at 53–54 (finding it "clear that the draft was part of a policy-oriented decisionmaking process," such that it was privileged). Defendants equate the handwritten notes to marginal comments in a draft document that were "presumably either helping to edit the draft or writing down excerpts from the report to participate in further deliberations." Second Herrington Decl. ¶ 9. Plaintiffs contest this

designation, arguing that that the agency's withholding of the document is unjustified because OASD-HA cannot specify whether the notes were editorial comments or excerpts from the report, such that the agency has not indicated the document's role in the deliberative process. Pls.' Mem. P. & A. Opp'n 16. This argument about the function of the notes, however, is wrong-headed. Regardless of whether the notes were created to edit the draft or to participate in further deliberations about the draft, the agency's declaration attesting that the notes reference particular pages of the draft, *see* Second Herrington Decl. ¶ 8, and the Court's *in camera* review of the notes establish that they are the opinions of the writer regarding particular pages of the draft. As such, OASD-HA Policy has amply specified the notes' relationship to the draft and, by extension, how they contributed to a drafting "process by which governmental decisions and policies are formulated." *Loving*, 550 F.3d at 38 (quoting *Klamath Water Users Protective Ass'n*, 532 U.S. at 8). Given that the draft is properly withheld in full pursuant to Exemption 5, it is logical that the notes are also properly withheld pursuant to that same privilege claim. Thus, the agency has adequately justified its application of the privilege here.

### c. OASD-HA Policy 758-59, 761-62, and 765-66

Plaintiffs' final deliberative process challenge concerns OASD-HA Policy 758-59, 761-62, and 765-66, which involve the same policy proposal and associated agency communications. Defendants' supplemental declaration provides specificity about the documents that was lacking in its prior submissions. *See Bloche II*, 370 F. Supp. 3d at 54. OASD-HA Policy 765-66 is a "request from the Army" seeking approval from the ASD(HA) "regarding the Army's proposed plan for handling a personnel matter under the provisions of DoDI 2310.08E," including "the Army's rationale for approving the request." Second Herrington Decl. ¶ 11. OASD-HA Policy 758-59 and 761-62 are email communications concerning the Army's Request. *Id.* ¶ 10. OASD-

HA Policy 761-62 consists of the ASD(HA) military assistant's email seeking "a recommendation from Health Affairs staff members on whether to grant" the Army's request, and OASD-HA Policy 758-59 is the reply email that contains the recommendation provided by these staff members. *Id.* Plaintiffs contend that this additional detail is not enough, contesting the use of the term "personnel-related matter" as "an extraordinarily vague and broad term that provides no specificity about the nature of the matter or how it related to decision-making policy." Pls.' Mem. P. & A. Opp'n 16–17.

Although the Court agrees that "personnel-related matter" is an imprecise designation in the abstract, when the phrase is read in context, the agency has provided additional specificity and related the matter to a particular deliberative process. The declaration provided gives enough detail for the Court to draw the conclusion that the "personnel-related matter arose under the provisions of DoD's detainee healthcare policy – DoDI 2310.08E – and stems from a request from the Army seeking the ASD(HA)'s approval of the Army's proposed plan for handling the matter." Defs.' Reply Supporting Renewed Mot. Partial Summ. J. 8 (citing Second Herrington Decl. ¶¶ 10–11). Because these communications were antecedent to any policy decision by ASD(HA) and written by individuals without decision-making authority, and because they operated to "facilitate or assist development of the agency's final position on the relevant issue," *Nat'l Sec. Archive*, 752 F.3d at 463, OASD-HA Policy has shown that the emails in OASD-HA Policy 758-59 and 761-62 qualify for the privilege. Moreover, the agency's supplemental discussion establishes that OASD-HA Policy 765-66, the text of the Army's initial request, also qualifies. This text contains "the Army's rationale" and "proposed plan" and is thus precisely the sort of document "seek[ing] a decision" that Exemption 5 protects in order to encourage uninhibited inter-agency dialogue. Second Herrington Decl. ¶ 11.

*d. Segregability*

Before approving the agency's invocation of the privilege with respect to OASD-HA Policy OASD-HA Policy 659, 758-59, 761-62, and 765-66, however, this Court must also "make specific findings of segregability regarding the documents to be withheld."[8] *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (citations omitted); *see also* 5 U.S.C. § 552(b). This analysis is especially critical for the deliberative process privilege, which "does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must." *Loving*, 550 F.3d at 38 (citation omitted). The agency may meet its segregability burden with a combination of a *Vaughn* Index and an affidavit or declaration establishing with "reasonably specificity" that it released all segregable material. *See Bloche II*, 370 F. Supp. 3d at 55 (citing *Johnson v. Exec. Office of U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002)).

Here, as described above, OASD-HA Policy has provided supplementary material in the form of a declaration that details the agency's withholdings. The agency has further averred that it conducted a "line-by-line review of OASD-HA Policy's records" and determined that it "released all reasonably segregable information." Second Herrington Decl. at ¶ 12. Plaintiffs contend that this statement is not enough, arguing that the withholding of draft documents in full suggests that OASD-HA Policy did not release non-exempt, factual information. Pls.' Mem. P. & A. Opp'n at 17–18. But this bare allegation does not overcome the "presumption" that the agency "complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117 (citing *Boyd v. U.S. Marshalls Serv.*, 475 F.3d 381, 391 (D.C. Cir. 2007)). Nor do

---

[8] The Court will assess whether OASD-HA Policy has properly segregated material in OASD-HA Policy 28-35 after further justification is provided for the withholding of this document.

Plaintiffs provide any evidence of an "alleged Government impropriety" that might overcome this presumption. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004). Thus, the supplemental materials submitted discharge the agency's obligation, and the agency may withhold OASD-HA Policy 695, 758-59, 761-62, and 765-66 pursuant to Exemption 5's deliberative process privilege.[9]

## B. Defendant Navy

The sole remaining issue in Defendants' renewed motion for summary judgment is Defendant Navy's application of Exemption 7(E) to withhold information in two documents, Navy 35 and Navy 38. *See* Defs.' Mem. P. & A. Supporting Renewed Mot. 5–7. Both of these documents "pertain to detainee interrogation operations at the United States Naval Base, Guantanamo Bay, Cuba." *Id.* at 7 (citing *id.* Ex. B, Declaration of Lieutenant Peter Tyson Marx, JAGC, USN ("Marx Decl.") ¶ 7a-b, ECF No. 110-3). For the reasons forth below, Navy has justified its invocation of Exemption 7(E) for the withheld portions of Navy 35 and Navy 38.

### 1. Exemption 7(E)

FOIA Exemption 7(E) permits an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement

---

[9] In contesting the application of this privilege and at various other points, Plaintiffs raise segregability issues and contend that Defendants must release "information sought and subsequently received" that "was in fact incorporated into the final decision or policy." Pls.' Mem. P. & A. Opp'n 17. But as the Court explained in its March 2019 memorandum opinion, this stance misstates the law: "FOIA does not require an agency to release portions of any draft that are ultimately repeated in the final policy." *Bloche II*, 370 F. Supp. 3d at 53 n.3. The deliberative process privilege is not rooted in formal determinations of this sort. Rather, it functions to shield material when its disclosure would harm agency deliberations by "divulg[ing] information regarding 'decisions to insert or delete material or to change [the] draft's focus or emphasis' and thus 'would stifle the creative thinking and candid exchange of ideas necessary to produce good . . . work." *Id.* (quoting *Hardy v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 243 F. Supp. 3d 155, 174 (D.D.C. 2017) (alteration and omission in original) (internal citation omitted)); *see also Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987).

records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). An agency seeking to apply Exemption 7(E) must, accordingly, make two showings. First, to demonstrate that the "records or information" were "compiled for law enforcement purposes," *id.*, the agency must establish both "a rational nexus between the investigation and one of the agency's law enforcement duties" and a "connection between an individual or incident and a possible security risk or violation of federal law," *Blackwell v. Fed. Bureau of Investigation*, 646 F.3d 37, 40 (D.C. Cir. 2011) (quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998)). Second, Exemption 7(E) requires the agency to "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Mayer Brown LLP v. Internal Revenue Serv.*, 562 F.3d 1190, 1194 (D.C. Cir. 2009) (quoting *PHE, Inc. v. U.S. Dep't of Justice*, 943 F.2d 248, 251 (D.C. Cir. 1993). These requirements must be met in a nonconclusory fashion, yet there is a "relatively low bar for the agency to justify withholding." *Blackwell*, 646 F.3d at 42.

### 2. Defendant's Application of Exemption 7(E)

#### a. Navy 35 and Navy 38

Navy 35 is a six-page memorandum dated January 31, 2001, from the Naval Criminal Investigative Service ("NCIS") Director to the Navy General Counsel that was "attached to a one-page memorandum from the Navy General Counsel to the Assistant Secretary of Defense (Special Operations & Low Intensity Conflict) dated February 4, 2003, with the subject line 'Proposed Alternative Approach to Interrogations.'" Marx Decl. ¶ 7a. This one-page

memorandum has been released in full to Plaintiffs, *id.*, and only the redactions in the six-page memorandum itself are presently contested.

Navy 38 is an eighteen-page document that partially overlaps with the material contained in Navy 35. *See* Marx Decl. ¶ 7b. Specifically, Navy 38 consists of the same one-page "Proposed Alternative Approach to Interrogations" memorandum and the same six-page memorandum contained in Navy 35. *Id.* Navy 38 additionally includes an eleven-page appendix entitled "Special Recommendations for Interrogators of Al-Qa'ida Detainees at Guantanamo Bay, Cuba." *Id.* This appendix is partially withheld under Exemption 7(E). *Id.* ¶ 7b(2).

Navy offers that the information contained in both Navy 35 and Navy 38 "readily meets the threshold requirement of Exemption 7"—that the materials were "compiled for law enforcement purposes," 5 U.S.C. § 553(b)(7)(E)—because it was "compiled to assist" NCIS "agents and other law enforcement personnel carry out their investigatory mission." Marx Decl. ¶ 7b(1). Navy further states that disclosure of the redacted portions of the six-page memorandum appearing in both Navy 35 and Navy 38 would reveal "psychological and strategic approaches to interviewing detainees that are not generally known to the public." *Id.* ¶ 7b(2). The agency paints a dim picture of public disclosure, warning that the information, if revealed, "could reasonably be expected to risk circumvention of the law because current and future military detainees could use the information to evade interrogation," thereby "significantly lower[ing] the effectiveness of these interviewing techniques" in ways that "could lead to unreliable information being obtained from interview subjects" in the future. *Id.* The agency offers additional discussion of the withheld information in Navy 38, which consists of "detailed psychological strategies and techniques designed to build rapport with Al Qa'ida detainees . . . that are not generally known to the public," and the release of which the agency warns could

compromise future interrogations "because current and future military detainees could use the information to evade interrogation." *Id.* ¶ 7b(3). For this document, Navy also offers further specification, noting that the document contains "details" concerning personnel, timing, the "reliability of certain kinds of information," and "psychological and physical indicators" for the interviewer to note. *Id.*

Plaintiffs make three arguments concerning the agency's application of 7(E). First, Plaintiffs question "what law enforcement purpose is involved." Pls.' Mem. P. & A. Opp'n 10. Second, Plaintiffs contend that Navy has not established "exactly what laws would purportedly be circumvented" if the psychological techniques and strategies discussed in the withheld portions of the documents were released. *Id.* Finally, Plaintiffs contend that Navy's asserted harms are baseless because "some (if not all) of the[] techniques have either been changed or rendered unlawful" in the "intervening years," such that public disclosure of the techniques cannot lead to a present-day risk of circumvention. *Id.*

Based on the supplementary declaration and *in camera* review of the agency's withholdings, Navy has the better argument on all three fronts. For one, the agency has cleared Exemption 7(E)'s threshold requirement. NCIS, which is located within the Department of the Navy, is "the civilian federal law enforcement agency uniquely responsible for investigating felony crime, preventing terrorism, and protecting secrets" for the U.S. Navy and U.S. Marine Corps. Marx Decl. ¶ 7b(1). NCIS is tasked with a "counterterrorism mission" and "is responsible for detecting, deterring, and disrupting terrorism worldwide through a wide array of investigative and operational capabilities." *Id.* As part of this mission, the agency has operated alongside "other law enforcement agencies" to "engage[] in investigatory activities related to the September 11, 2001, terrorist attacks, and the individuals detained at the United States Naval

Base at Guantanamo Bay, Cuba." *Id.* As Defendants argue, the NCIS mission centers on matters of counterterrorism and national security, which courts in this Circuit have found to fall within "the realm of law enforcement purposes sufficient to justify withholding based on Exemption 7." *See* Defs.' Mem. P. & A. Supporting Renewed Mot. (citing *Am. Civil Liberties Union of S. Cal. v. U.S. Citizenship & Immigration Servs.*, 133 F. Supp. 3d 234, 242 (D.D.C. 2015) (citations omitted)); *see also Strang v. U.S. Arms Control & Disarmament Agency,* 864 F.2d 859, 862 (D.C. Cir. 1989) (reading the term "law enforcement" as "encompassing the enforcement of national security laws as well"); *Pratt v. Webster,* 673 F.2d 408, 420 (D.C. Cir. 1982) (concluding that there must be a connection between the "activities that give rise to the documents sought" and "enforcement of federal laws or . . . the maintenance of national security").

This description establishes an adequate connection between the records at issue and NCIS's law enforcement duties. *See Blackwell*, 646 F.3d at 40 (quoting *Campbell*, 164 F.3d at 32). Logically, NCIS cannot carry out its law enforcement function with respect to the investigation of individuals detained at the Naval Base in Guantanamo Bay, Cuba, Marx Decl. ¶ 7b(1), without an established approach to interrogation. Based on the titles of the materials and the agency's discussion of them, the documents were drafted to reevaluate the agency's approach to interrogation. Thus, so long as NCIS compiled materials for law enforcement purposes and satisfies the second prong of Exemption 7(E)—discussed next—it may invoke the exemption.

Although 7(E) sets a low bar, clearing it nonetheless requires more than merely restating the relevant legal standard. Navy's declaration clears the bar for Navy 38: the Marx Declaration provides particularized details concerning aspects of the withheld eleven-page memorandum, such as details regarding "timing of demands" and "physical and psychological indicators,"

disclosure of which it asserts could "reasonably be expected to risk circumvention of the law because current and future military detainees could use the information to evade interrogation." *Id.* at ¶ 7b(3). Contrary to Plaintiffs' argument, the law does not demand that Defendants identify a particular law that would be evaded; rather, FOIA asks only that the agency "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown LLP,* 562 F.3d at 1194 (alterations omitted)). The justification provided for Navy 38 establishes a logical chain that connects the information in the documents, in sufficient detail, to make this demonstration with regard to the eleven-page appendix. But the agency's justification falls below even the low bar of 7(E) for the six-page memorandum that appears in both Navy 35 and Navy 38. All that Navy offers is a permutation of the legal standard, made without particularity: the threat that the public release of the document would compromise the effectiveness of the interrogation techniques at issue. *See* Marx Decl. ¶¶ 7b(2)-(3). What Navy has failed to provide in its supplemental filings are adequate details (of the sort it offered for Navy 38) about what kinds of information the document contains. As such, it has not specified in a nonconclusory way how release of the information "could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

That said, an assertion made by a law enforcement agency invoking Exemption 7(E) is entitled to deference, *see Campbell*, 164 F.3d at 32, and the Court's *in camera* review of the document indicates that the partial redaction is appropriate in order for Navy to shield particular details of its interrogation strategy. Plaintiffs' third argument concerning timing does not change this conclusion. As Defendants note, the Marx Declaration refers to a risk of evasion for "current and future military detainees" and the potential impact on "future investigations and

interviews." Defs.' Reply Supporting Renewed Mot. 4 (citing Marx Decl. ¶¶ 7b(2)-(3)).

Plaintiffs have not pointed to any reason to discredit this statement. Taking this sworn

declaration at its word, it appears that the techniques are in fact still in use, and Plaintiffs'

contention is unavailing. Thus, Navy may withhold in part Navy 35 and Navy 38 pursuant to

FOIA Exemption 7(E).[10]

## IV. CROSS-MOTIONS FOR SUMMARY JUDGMENT

As previously stated, also before the Court are cross-motions for summary judgment

involving a different set of Defendant agencies—Army, SOCOM, DIA, CENTCOM, and JTF-

GTMO—and Plaintiffs' challenge to these agencies' application of FOIA exemptions. *See* ECF

Nos. 96, 97. Sixty nine of the seventy-eight documents contested at this juncture involve

Defendant Army. *See* Pls.' Reply Ex. 1, Updated History of Disputed Docs, ECF No. 101-1.[11]

Army invokes various combinations of deliberative process, attorney-client, and attorney work

product privilege pursuant to FOIA Exemption 5, *see* 5 U.S.C. § 552(b)(5), to withhold sixty-

nine documents in part or in full,[12] *see* Pls.' Reply Ex. 1, Updated History of Disputed Docs. 2–

5. The Court begins with the challenges to Army's documents before addressing the exemptions

---

[10] This Court previously confirmed that Defendant Navy satisfied its burden confirming segregability, *see Bloche II*, 370 F. Supp. 3d at 55–56, and no new arguments have been raised nor any new evidence presented on this matter. The Court thus need not reassess this issue here.

[11] Because this table is not paginated, the Court refers to the ECF page numbers when discussing it.

[12] Defendant Army originally also applied FOIA Exemption 1, *see* 5 U.S.C. § 552(b)(1), to Army 112 and Army 113. However, because the Army cannot locate unredacted versions of these documents, it is not possible for an Original Classification Authority to conduct a classification review in the manner that Exemption 1 requires. Defs.' Mot. Partial Summ. J. Ex. B, Declaration of Major John E. Swords ("Swords Decl.") ¶ 5 n.2, ECF No. 96-3. The Army "relies on its prior Exemption 5 determination," conducted in 2008, "for purposes of this motion." *Id.* Thus, the Court considers only whether Army has adequately justified its application of Exemption 5 to withhold in full Army 112 and Army 113.

applied by the other four Defendant agencies. For the reasons set forth below, only Defendant CENTCOM has provided sufficient justification for all of the claimed exemptions.

## A. Army

### 1. Exemption 5

Again, Exemption 5 exempts documents that are "normally privileged in the civil discovery context." *Sears*, 421 U.S. at 149. In addition to the deliberative process privilege, which this Court discussed above in addressing Defendants' renewed motion for partial summary judgment, ECF No. 110, Exemption 5 includes two other privileges that Army also invokes: the attorney-client privilege, and the work product privilege. *See Brown*, 317 F. Supp. 3d at 375; *Loving*, 550 F.3d at 37.

The attorney-client privilege covers "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Cent., Inc.*, 566 F.2d at 252. It is not limited to the context of litigation, *see id.* at 252–53; rather, it "also protects communications from attorneys to their clients if the communications 'rest on confidential information obtained from the client.'" *Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C. Cir. 1997) (quoting *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984)). If the communications suggest that "the Government is dealing with its attorneys as would any private party seeking advice to protect personal interests," *Coastal States*, 617 F.2d at 863, then a court may infer confidentiality. That said, a court should narrowly construe the attorney-client privilege, which "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Id.* at 862–63 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

The work product doctrine "shields materials 'prepared in anticipation of litigation or for trial by or for [a] party or by or for that . . . party's representative (including the . . . party's attorney, consultant, . . . or agent).'" *Tax Analysts*, 117 F.3d at 620 (quoting Fed. R. Civ. P. 26(b)(3)); *see also Hickman v. Taylor,* 329 U.S. 495 (1947). This doctrine protects deliberative materials as well as "factual materials prepared in anticipation of litigation." *Tax Analysts*, 117 F.3d at 620 (citing *Martin v. Office of Special Counsel,* 819 F.2d 1181, 1184–87 (D.C. Cir. 1987); *A. Michael's Piano, Inc. v. Fed. Trade Comm'n,* 18 F.3d 138, 147 (2d Cir. 1994)). Thus, it provides relatively broader coverage than the deliberative process privilege. However, to qualify for such coverage, the document must have been prepared "in anticipation of foreseeable litigation." *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992), *abrogated on other grounds by Milner v. Dep't of Navy*, 562 U.S. 562 (2011) (emphasis added) (citing *Delaney, Migdail & Young, Chartered v. Internal Revenue Serv.*, 826 F.2d 124, 127 (D.C. Cir. 1987)). To establish that litigation is foreseeable, the bare fact that "litigation might someday occur" is insufficient. *Senate of the Commonwealth of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 587 (D.C. Cir. 1987) (quoting *Coastal States*, 617 F.2d at 865). As is the case for all parts of Exemption 5, this privilege is to be read narrowly. *See id.* at 584 ("Congress intended to confine exemption (b)(5) 'as narrowly as [is] consistent with efficient Government operation.'" (quoting *Coastal States*, 617 F.2d at 868)). And again, as is the case for all FOIA exemptions, the agency seeking to invoke the exemption must "establish [its] right to withhold evidence from the public," *Coastal States*, 617 F.2d at 861, and must carry this burden with a "relatively detailed justification" of its application of the privilege. *Elec. Privacy Info. Ctr.*, 192 F. Supp. 3d at 103 (quoting *Mead Data Cent., Inc.*, 566 F.2d at 251).

Because Army's application of Exemption 5 involves various combinations of the privileges available to it under this exemption, the Court will begin with the simplest case—the contested documents that involve only the deliberative process privilege—and then proceed to Army's other privilege claims.

### 2. Defendant Army's Claims of Deliberative Process Privilege

Army withholds twenty-two of the challenged documents in full or in part under only the deliberative process privilege.[13] The majority of these documents are draft documents and surrounding agency discussion thereof, including email exchanges. A handful involve the agency's formulation of external communications and publicity plans. In a vacuum, these are the sorts of documents that reflect an agency's deliberative process and thus fall within the scope of the privilege. *See, e.g.*, *Reliant Energy Power Generation, Inc. v. Fed. Energy Regulatory Comm'n.*, 520 F. Supp. 2d 194, 204 (D.D.C. 2007) ("An agency may withhold a draft document if there is a danger of 'chilling' communication within the agency" (quoting *Dudman Commc'ns*, 815 F.2d at 1569)); *Competitive Enter. Inst. v. EPA.*, 12 F. Supp. 3d 100, 118 (D.D.C. 2014) (applying privilege to documents that reflect "ongoing decisionmaking about how the agency's activities should be described to the general publics" (quoting *Nat'l Sec. Archive v. Fed. Bureau of Investigation*, No. 88-1507, 1993 WL 128499, at *2 (D.D.C. Apr. 15, 1993)); *Thompson v. Dep't of Navy*, No. 95-347 (RMU), 1997 WL 527344, at *4 (D.D.C. Aug. 18, 1997) (permitting agency to withhold information related to its determination of what to disclose to the media). That said, in practice, the deliberative process privilege is highly context-specific: the

---

[13] These documents, which the Court identified based on the Revised Updated Army *Vaughn* Index, *see* Defs.' Mem. P. & A. Opp'n Pls.' Cross Mot. Partial Summ. J. ("Defs.' Mem. P. & A. Opp'n") Ex. 1, ECF No. 99-2, are: Army 15, Army 16, Army 20, Army 22, Army 25, Army 26, Army 39, Army 46, Army 54, Army 62, Army 63, Army 64, Army 67, Army 71, Army 72, Army 82, Army 83, Army 84, Army 85, Army 87, Army 97, and Army 105.

propriety of its application is "dependent upon the individual document and the role it plays in the administrative process." *Elec. Frontier Found. v. U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 167–68 (D.D.C. 2011) (quoting *Animal Legal Defense Fund, Inc. v. Dep't of the Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999)); *see also Coastal States*, 617 F.2d at 867. To carry its burden regarding the privilege, then, Army must provide a "relatively detailed justification" for each of the documents that contextualizes how the withheld information relates to a policy-oriented decisionmaking process. *Mead Data Cent., Inc.*, 566 F.2d at 251.

Many of Army's deliberative process claims concerning draft documents and associated communications provide the requisite justification. The agency's drafts and deliberations around Army Field Manual 2-22.3 ("FM 2-22.3") are illustrative.[14] Army has withheld in full four draft versions of FM 2-22.3 or its appendices: Army 15, Army 16, Army 20, and Army 22. Defs.' Mem. P. & A. Opp'n Ex. L, Second Declaration of Major John E. Swords ("Second Swords Decl.") ¶ 10a. The Second Swords Declaration establishes that each of these drafts was produced before FM 2-22.3's adoption, *id.*, which makes them predecisional. *See Access Reports*, 926 F.2d at 1195 (quoting *Taxation with Representation Fund,* 646 F.2d 666, 677 (D.C. Cir. 1981), for the proposition that "[p]redecisional documents are thought generally to reflect the agency 'give-and-take' leading up to a decision that is characteristic of the deliberative process" (emphasis in original)). In addition, the agency's revised updated *Vaughn* Index, *see* ECF No. 99-2, provides adequate detail to identify "a policy-oriented decisionmaking process to which the draft contributed," *Bloche II*, 370 F. Supp. 3d at 51. For instance, the entry for Army 15 establishes that the document at issue is a "draft policy appendix, with comments, addressing a particular restricted interrogation technique," and states that the agency withheld it in full

---

[14] As the Court addresses below, this is not the case for Army 25 and Army 26, which also involve FM 2-22.3, but which the Army has been unable to locate in an unredacted form.

because of its draft status and the fact that it contains "comments which include recommendations and opinions regarding legal and policy matters."[15] Revised Updated Army *Vaughn* Index 1. Given this draft's status as part of the decisionmaking process around how to develop the new FM 2-22.3, *see* Second Swords Decl. ¶¶ 7, 10a, this material is deliberative and, hence, privileged. The same is true of the four drafts of FM 2-22.3 and its appendices,[16] *see* Revised Updated Army *Vaughn* Index 1–2, as well as Army 46, an email chain and attached

---

[15] Although the entries for the other drafts repeat similar or even identical language, this repetition is logical when, as here, all of the drafts relate to the agency's formulation of the same policy proposal. As such, repetition alone does not make the text the sort of conclusory, rote assertion that fails to satisfy Exemption 5's demands. This Circuit's law "ha[s] never required repetitive, detailed explanations for each piece of withheld information." *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 147 (D.C. Cir. 2006) (citing *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349–50 (D.C. Cir. 1987)). Rather, "[e]specially where"—as is the case here—"the agency has disclosed and withheld a large number of documents, categorization and repetition provide efficient vehicles by which a court can review withholdings that implicate the same exemption for similar reasons." *Id.*; *see also Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 236–37 (D.D.C. 2013) ("[T]he government need not furnish repetitive descriptions of the same type of document and may describe *commonalities* among its withholdings" (citing *Judicial Watch*, 449 F.3d at 147)).

[16] Although Plaintiffs challenge the withholding of Army 20 on the grounds that this document is labeled as a "working version," Pls.' Reply 18–19, the mere designation of this document as a "draft/working version," *see* Revised Updated Army *Vaughn* Index 1, does not compel the conclusion that the agency must disclose it in full. Without more firm evidence to suggest that the draft was in fact "informally adopted," Pls.' Reply 19, "as the agency position on an issue" in a manner that would defeat the claim of privilege, *Judicial Watch v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 261 (D.D.C. 2004) (quoting *Arthur Andersen & Co. v. Internal Revenue Serv.*, 679 F. 2d 254, 257 (D.C. Cir. 1982), there is no reason to discredit the agency's statement that the draft preceded and contributed to the development of the final version, *see* Swords Decl. ¶ 7, and thereby played a role in that policy-oriented decision-making process in a manner that justifies its privileged status. Without more concrete evidence, the Court will not infer that the agency adopted a position taken in a draft as a final decision in a way that requires disclosure. *See Trans Union LLC v. Fed. Trade Comm'n*, 141 F. Supp. 2d 62, 70–71 (D.D.C. 2001) (concluding that, "where it is unclear whether" initial input from the agency provided the basis for its final output, the input "is exempt from disclosure" (citing *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184–185 (1975)). Nor, despite Plaintiffs' argument, must the agency demonstrate the extent to which a draft differs from the final document—which would itself expose its deliberative process. *See Reliant Energy*, 520 F. Supp. 2d at 204 (quoting *Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 698 (D.D.C. 1983)).

draft policy on "Gap Analysis, Behavioral Science Consultation ['BSC'] to Interrogation and Detention Operations" that is "annotated with notes, comments, and questions posed by various personnel during coordination of the [BSC] policy," *id.* at 9.[17]

So, too, do the agency's justifications suffice when it comes to many of the internal communications surrounding its development of not only FM 2.22-3, but also other agency policies. Take Army 72, which consists of an email chain with an attached draft PowerPoint that was prepared for a "Familiarize Brief" on the proposed FM. *See* Revised Updated Army *Vaughn* Index 23. The agency has "redacted portions of [the] email regarding recommended changes to [the] [P]ower[P]oint brief," which is withheld in full. *Id.* Although Army would, ideally, speak with more precision to define the purpose and expectations of a "Familiarize Brief," the material provided logically indicates that the PowerPoint is a draft briefing document and that the email chain contains "recommended changes" to it. *Id.* By indicating the context (development of the agency's position concerning the FM) for which the material was produced, Army has amply "'identif[ied the decisionmaking *process*' to which the withheld documents contributed." *Elec. Frontier Found. v. U.S. Dep't of Justice*, 890 F. Supp. 2d 35, 52 (D.D.C. 2012) (emphasis in original) (quoting *Sears*, 421 U.S. at 150). Army has thus established how releasing the withheld materially could logically and plausibly chill agency deliberations concerning the draft FM,

---

[17] Plaintiffs contest the withholding of this document at some length, challenging, in particular, Defendants' assertion that "the Gap Analysis was never finalized and is therefore exempt" on the grounds that "a gap analysis typically compares . . . proposed policy and current policy," such that "even a non-finalized gap analysis would contain" unprivileged "information about current policy." Pls.' Reply 18. But this contestation as to whether the agency *segregated* non-privileged material in the document is a different issue from whether the privilege applies to the document at all, and Plaintiffs fail to present any independent reason to believe that this draft policy memoranda and the surrounding communication about it are not properly part of Army's deliberative process.

thereby undermining the purpose of the privilege.[18]  *See Scudder*, 254 F. Supp. 3d at 140

(quoting *Judicial Watch*, 715 F.3d at 941).  Army provides similar, if not more detailed,

justification for its application of the privilege to other email chains concerning other developing

agency policies.  As an illustration of a particularly detailed description, consider Army 39,

which the agency has explained consists of two emails exchanged in February 2005 and

December 2004 "between a Womack Army Medical Center Doctor and various Army doctors"

that consist, respectively, of the "notes on a meeting with a Special Operations Command

Clinical Psychologist and his opinions and recommendations on the presence of psychologists

during interrogations" and a message "sent by the Director of the Psychological Applications

Directorate of the Army's Special Operations Command to a[] Special Operations Command

employee enumerating his opinions and recommendations regarding what the mission objectives

should be for psychologists providing support to detainee operations."  Revised Updated Army

*Vaughn* Index 6.

      Although Army provides slightly less detail, it has also adequately justified its redactions

for most of its other applications of the privilege.  The majority of these applications are partial

withholdings in email chains concerning the "logistics of coordinat[ing] review of" a "Proposed

SecDef Memo on Ethics Principles and Procedures for Detainees," *id.* at 20 (discussing Army

67); *see also id.* at 23 (similar description for Army 71), "seeking advice and assistance" from

agency attorneys "on tracking of investigations based on allegations of improper behavior in

---

[18] Plaintiffs do not directly contest this conclusion, but instead argue that the PowerPoint is "extremely likely" to "contain factual information and information on current policies in order to contextualize the proposed changes," which "must be segregated out" and released.  Pls.' Mem. 28.  But again, the question of whether the agency has met its burden to release all reasonably segregable, *non-exempt* material is a distinct issue from whether the material is properly privileged, and hence *exempt*, in the first instance.  The Court discusses segregability below.

relation to detainee operations," *id.* at 30 (discussing Army 82); "addressing concerns raised by DOD" about a draft Army document, the "Interim Guidance on Detainee Medical Care," *id.* at 31 (discussing Army 83); *see also id.* (similar description for Army 84); *id.* at 32 (similar description for Army 85),[19] and an email chain between attorneys "addressing proposed changes to AR 190-8 and the legal implications of some of the proposed changes," *id.* at 34 (discussing Army 87). For these documents, Army details between which parties the emails were sent, establishes that the emails contain opinions and recommendations, and discusses the relationship between the email and a particular policy development process, thereby adequately supporting its invocation of the privilege. The same is true of the email chains with attachments. *See, e.g.*, *id.* at 15 (discussing Army 54, a partially redacted email and attachment concerning Final Coordination on DoD Instruction 2310.kk, including a fully withheld comment matrix with proposed edits); *id.* at 41 (discussing Army 97, a partially withheld email chain and attachment "discussing legal opinions on a draft policy memo on Medical Ethics Principles and Procedures for the Protection and Treatment of Detainees in the Custody of the Armed Forces of the United

---

[19] Plaintiffs object that these documents cannot be shielded because Army "largely relies on 'boilerplate language' to justify its withholdings," asserting that "Defendants have consistently failed to identify 'the nature of the decisionmaking authority vested in the document's author and recipient'" and instead relied on inadequate "broad conclusory statements." Pls.' Reply 21 (first quoting *Hunton & Williams LLP v. U.S. Envtl. Protection Agency*, 346 F. Supp. 3d 61, 74 (D.D.C. 2018), then citing *Mead Data Cent., Inc.*, 566 F.2d at 258). But mere repetition with regard to more than one document, which Plaintiffs characterize as "boilerplate" language, is not necessarily the sort of conclusory justification that falls short of FOIA's demands. The relevant question is whether the agency has established how the documents at issue relate to the formulation of the agency's policy. If the policy is the same in more than one instance, then it is logical that the agency's justification would also be similar. On the description provided, it is sufficiently clear that the challenged documents involved recommendations offered up as part of a particular deliberative process. *See Nat'l Sec. Archive*, 752 F.3d at 463 (applying privilege where it is clear that "the communication is intended to facilitate or assist development of the agency's final position on the relevant issue."). Thus, the privilege is justified.

States," with the draft policy memo redacted in full). The redacted portions of these documents are thus privileged.

The remaining challenged documents involve the agency's development of its position concerning FM 2-22.3 or its internal discussions concerning other agency policies. Some of these documents provide the "relatively detailed" justification required to apply the privilege. Army 62 is illustrative of an adequate justification. This document consists of a "[d]raft communications plan prepared by the Army's office of the Chief of Public Affairs for [the] purpose of developing a media and public affairs strategy for the issuance of the FM." Revised Updated Army *Vaughn* Index 17. The agency makes clear that this "draft communications plan . . . was prepared to assist the Army in navigating the significant public interest in detainee interrogation methods by proposing a media and public affairs strategy for announcing" the FM's "upcoming issuance." Second Shields Decl. ¶ 10. This description sufficiently establishes that the document played a role in Army's decisionmaking about how to communicate the developing policy to the public, *see Competitive Enter. Ins.*, 12 F. Supp. 3d at 118 (quoting *Nat'l Sec. Archive*, 1993 WL 128499, at *2), such that it is privileged. Along similar lines, Army provides sufficient justification to withhold in part Army 105, which consists of "notes prepared by attorneys for senior Army personnel in order to assist in their preparation for addressing a [c]ongressional committee regarding the Common Article 3 Executive Order." Revised Updated Army *Vaughn* Index 43. The agency clarifies that the relevant deliberative process at issue is Army's decision about "what information should be provide to Congress" and specifies that the "list of talking points reflects internal deliberations regarding what information" to provide. *Id.*

But Army's other privilege claims are insufficiently supported. Consider Army 63 and Army 64, which both consist of "questions and answers in draft form addressing various Army

concerns or points of clarification about the new Army FM 2-22.3." Revised Updated *Vaughn* Index 18. The agency states that these draft questions and answers addressed "the Army's forthcoming issuance of the FM" and were "prepared for decision makers to address various concerns and points of clarification with the proposed FM." Second Shields Decl. ¶ 10. However, Army never identifies or describes which decisionmakers were targeted, nor does it state what sorts of concerns or points of clarification were involved with any particularity. Without more to contextualize the agency's development of and subsequent reliance on—or lack thereof—the reasoning in these documents, the Court cannot be certain that these documents entail predecisional "formulation or exercise of . . . policy-oriented *judgment*." *Bloche II*, 370 F. Supp. 3d at 54 (quoting *Prop. of the People*, 330 F. Supp. 3d at 382 (emphasis in original)); *see also Petroleum Info. Corp*, 976 F.2d at 1435.

Nor has Army adequately justified its withholding in full of four documents, Army 25, Army 26, Army 112, and Army 113, all of which it seeks to shield in full pursuant to Exemption 5's deliberative process privilege.[20] Because Army cannot locate unredacted versions of these four documents,[21] it "relies on its prior Exemption 5 determination," reached in 2008, "for purposes of this motion." Swords Decl. ¶ 5 n.2. The problem with this reliance, however, is that

---

[20] Army states that it withholds Army 25 and Army 26 "as deliberative process," Revised Updated Army *Vaughn* Index 3, but does not specifically mention deliberative process privilege for Army 112 or 113. *See id.* at 45. The Court infers that this is the privilege on which Army relies based on its assertion that the documents are "[f]ully exempt under (b)(5)" "given their [status as] classified, deliberative and advisory documents prepared prior to an agency decision" and the fact that they "include[] recommendations or express opinions on legal and policy matters before the Department of the Army." *Id.* If Army intends to invoke attorney-client privilege in addition to or in lieu of deliberative process privilege, then it must explicitly do so.

[21] As previously noted, although Plaintiffs' reply brief contests the adequacy of Army's search for these four missing documents, *see* Pls.' Reply 2, Plaintiffs waived this argument given the failure to develop this objection until this late stage, apart apart from a passing reference in a footnote in its opening brief. *See Sitka Sound Seafoods, Inc.*, 206 F.3d at 1181. Thus, the Court considers only the Army's application of exemptions to these four documents.

the agency has not "describe[d] the requested documents and 'the justifications for nondisclosure with reasonably specific detail.'" *Pronin*, 2019 WL 1003598, at *3 (quoting *Larson*, 565 F.3d at 862). The agency's 2008 declaration does not speak to these documents at all, instead focusing primarily on the search that Army originally conducted. *See* Defs.' Mot. Partial Summ. J. Ex. B-1, Declaration of Lisa M. Satterfield, ECF No. 96-3. Nor do Army's 2018 declarations provide any justification for nondisclosure of these four documents.[22] This showing does not establish that the documents are privileged in their entirety. To be sure, Army does describe the nature of the documents with reasonable specificity. For instance, Army 25 is a draft appendix to the draft FM 2-22.3 that "addresses restricted interrogation approach techniques." Revised Updated Army *Vaughn* Index 3; *see also id.* (same justification for Army 26). And Army 112 is a memorandum with the subject "Final Report and Recommendations to Assess the Legal, Policy, and Operational Issues Relating to Interrogation of Detainees Held by the U.S. Armed Forces (2/11/2003). *Id.* at 45; *see also id.* (describing Army 113 as memorandum that contains the Judge Advocate General's legal opinions on the Department of Justice's stance regarding "current and significant operational law issues" for "enemy combatants held at Guantanamo Bay"). But given that Army does not have access to the unredacted document, this description alone cannot justify its withholding *in full*. Army has not presently provided any justification for withholding the unredacted portions, and this lack of justification gives it "no standing to invoke exemptions." *Piper v. U.S. Dep't of Justice*, 294 F. Supp. 2d 16, 32 (D.D.C. 2003), *amended*, 428 F. Supp. 2d 1 (D.D.C. 2006), *aff'd sub nom. Piper v. U.S. Dep't of Justice*, 222 F. App'x 1 (D.C. Cir. 2007). The fact "that the Government can no longer locate the file" in unredacted

---

[22] The original Swords Declaration speaks solely to the "thorough and exhaustive search" that Army conducted to attempt to locate the documents, Swords Decl. ¶ 3 n.1, and the Second Swords Declaration, *see* ECF No. 99-2, does not discuss them at all.

form "does not give it license to withhold information with the caveat that it could not track down the documents when challenged." *Id.* Army must, accordingly, describe in "reasonably specific" detail how all of the withheld portions relate to a particular deliberative process. Until such time, Army has not established that Army 25, 26, 112, and 113 are properly shielded under the deliberative process privilege.

In sum, then, the Court grants Defendants' motion for summary judgment with respect to all of their deliberative process privilege claims, with the exception of the six documents identified in the preceding discussion: Army 25, Army 26, Army 63, Army 64, Army 112, and Army 113. As the Court explained in *Bloche II*, where, as here, "an agency fails to meet its burden, FOIA provides courts 'a host of procedures' to determine whether the exemption claim is proper, including discovery, further agency affidavits, and *in camera* review of the records in question." 370 F. Supp. 3d at 55 (quoting *Allen v. Cent. Intelligence Agency*, 636 F.2d 1287, 1298 (D.C. Cir. 1980), *abrogated on other grounds by Founding Church of Scientology of Wash., D.C., Inc. v. Smith*, 721 F.2d 828, 830–31 (D.C. Cir. 1983)). In general, "a district court should not undertake *in camera* review of withheld documents as a substitute for requiring an agency's explanation of its claimed exemptions." *Spirko*, 147 F.3d at 997. Nonetheless, "*in camera* inspection may be particularly appropriate . . . when the number of withheld documents is relatively small." *Id.* at 996 (internal quotation marks omitted)); *see also Gatore v. U.S. Dep't of Homeland Sec.*, 292 F. Supp. 3d 486, 495 (D.D.C. 2018) (finding *in camera* review the "most efficient means" of resolving an issue "given the small number of documents at issue); *Physicians for Human Rights v. Dep't of Def.*, 675 F. Supp. 2d 149, 167 (D.D.C. 2009) (quoting *Allen*, 636 F.2d at 1298) (same). In this instance, given the relatively small number of documents at issue, the Court finds further agency supplementation along with *in camera* review

of the documents to be the most expeditious resolution. Thus, Army must provide these materials to the Court along with updated justifications for its claims of deliberative process privilege, either in the form of new declarations or a revised *Vaughn* index, *see Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973), whereupon it may, if it continues to apply deliberative process privilege to the contested documents, submit a renewed motion for summary judgment.

### 3. Defendant Army's Claims of Attorney-Client Privilege

Army relies on another part of Exemption 5, the attorney-client privilege, to withhold in part Army 80 and to withhold in full Army 96. Unlike the documents discussed below, for which Army invokes both attorney-client privilege and another privilege, the attorney-client privilege is the sole basis for these redactions. Plaintiffs challenge both of these withholdings, contending that Army's updated declaration, *see* Second Swords Decl., still fails to establish "how or why these records were meant to be confidential or whether they were actually kept confidential," Pls.' Reply 12. Although Plaintiffs are correct that the agency claiming attorney-client privilege must show confidentiality and thereby demonstrate that the privilege is applicable, *see Mead Data Cent., Inc.*, 566 F.2d at 254, for the reasons set forth below, Army has carried its burden for both of the challenged documents.

Army 80 and Army 96 consist of emails dated July 6, 2005, and July 7, 2005, respectively, on the same topic. Each document is described in Army's *Vaughn* Index as an "[e]mail from a [Department of the Army] Office of the General Counsel Attorney to an Office of Congressional Legal Liaison member addressing legal concerns raised by the DoD with respect to the Army's position on the treatment of detainees, as well as recommendations as to how the DoD's legal concerns should be incorporated into [c]ongressional briefings." Revised Updated Army *Vaughn* Index 29, 41. Army 96 includes "the sole email comprising Document

80, as well as two additional emails between the same individuals with the Senior Deputy General Counsel cc'd" that "contain opinions and recommendations regarding the inclusion of specific information in a briefing for the Secretary of Defense." Second Swords Decl. ¶ 9b(ii). For both documents, Army redacted portions of the email communications, which the agency states were "made in confidence," with "no record of that confidentiality being compromised in the intervening years." Second Swords Decl. ¶¶ 9b(i)–(ii); *see also* Revised Updated Army *Vaughn* Index 29, 41.

With this combination of the *Vaughn* Index and its declarations, Army has adequately justified its application of the privilege. Because the attorney-client privilege "protects communications from attorneys to their clients if the communications 'rest on confidential information obtained from the client,'" *Tax Analysts*, 117 F.3d at 618 (quoting *In re Sealed Case*, 737 F.2d at 98–99), and this was a communication in which an Army attorney conveyed her position on "legal concerns" regarding an agency position to an agency client, Army has established that this is the sort of communication that the privilege protects. *See also In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014) ("[T]he [attorney-client] privilege applies to a confidential communication between an attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client."). Moreover, Army's description carries its burden to "demonstrate that confidentiality was expected in the handling of these communications, and that it was reasonably careful to keep this confidential information protected from general disclosure." *Coastal States*, 617 F.2d at 863. Plaintiffs' contrary argument is misguided. Army explicitly states that the communications were made in confidence. *See* Second Swords Decl. ¶ 9b(i). And the Court credits the sworn statement that there is "no record of" "confidentiality being compromised," *id.*, as adequate

evidence that they were in fact maintained internally and not divulged in a manner that would compromise confidentiality. In short, there is no reason, based on the evidence Plaintiffs offer, to question the confidentiality of the communication. *See Hunton & Williams, LLP*, 248 F. Supp. 3d at 256 (affirming agency's attorney-client privilege claim where there was no indicia that the documents were distributed to outside entities). The redacted portions of Army 80 and Army 96 are, accordingly, privileged and appropriately withheld.

### 4. Defendant Army's Overlapping Privilege Claims

The remainder of the documents that Army has withheld in full or in part pursuant to Exemption 5 involve more than one privilege claim. The Court will first assess Army's overlapping attorney-client and attorney work product privilege claims before turning to its overlapping deliberative process and attorney-client privilege claims. For the reasons set forth below, Army has justified only a few of its withholdings in these categories based on the material provided.

#### a. *Attorney-Client Privilege and Attorney Work Product Privilege*

Army has applied both attorney-client and attorney work product privilege to three contested documents: Army 81, Army 95, and Army 111. Again, the purpose of each of these privileges is distinct. *See Coastal States*, 617 F.2d at 864. The attorney-client privilege, as the Court just discussed, "protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services" as well as "communications from attorneys to their clients if the communications 'rest on confidential information obtained from the client.'" *Tax Analysts*, 117 F.3d at 618 (quoting *In re Sealed Case*, 737 F.2d at 98–99). The narrower attorney work product privilege "shields materials 'prepared in anticipation of litigation or for trial by or for [a] party or by or for that . . . party's representative.'" *Id.* at 620 (quoting

Fed. R. Civ. P. 26(b)(3)).  Plaintiffs make two general arguments regarding these documents: Army's justifications for attorney-client privilege are conclusory, and Army's justifications for attorney work product privilege fail to establish that the documents were prepared in anticipation of litigation.  Pls.' Reply 12–13; *see also* Pls.' Mem. 35.  For the reasons set forth below, Army has adequately justified its application of the work product privilege to Army 95 and the attorney-client privilege to Army 81, but its submissions are insufficient to justify its withholding in full of Army 111.

Two of the contested documents, Army 95 and Army 81, are email communications concerning allegations of improper behavior in detainee operations, detainee abuse, and associated investigations.  *See* Revised Updated Army *Vaughn* Index 31, 40.  Army details the investigation at issue in Army 95: this document consists of "an email chain beginning with a request to several agency directorates and their counsel from Major General George Fay for assistance with answering a follow-up question to his investigative findings and recommendations regarding allegations of detainee abuse at Abu Ghraib that were lodged against specifically identified U.S. soldiers."  Second Swords Decl. ¶ 9b(iv).  Army states that the redacted portions of the email chain involve "agency counsel's legal opinions and recommendations regarding the possibility of criminal prosecutions as a result" of the investigation.  *Id.*

These statements suffice to establish that this document qualifies for work product privilege.  Plaintiffs are correct that the bare prospect that "litigation might someday occur" is too insubstantial a ground to justify invocation of this privilege.  *Senate of the Commonwealth of Puerto Rico*, 823 F.2d at 587.  That said, "Exemption 5 extends to documents prepared in anticipation of foreseeable litigation, even if no specific claim is contemplated."  *Schiller*, 964

F.2d at 1208 (citing *Delaney, Migdail & Young, Chartered v. Internal Revenue Serv.,* 826 F.2d 124, 127 (D.C. Cir. 1987)).  The relevant standard is whether the government's attorney "prepared a document in the course of an investigation that was undertaken with litigation in mind."  *Boyd v. Executive Office for United States Attorneys*, 87 F. Supp. 3d 58, 84 (D.D.C. 2015) (quoting *Safecard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1202 (D.C. Cir. 1991)); *see also Agility Public Warehousing Company K.S.C. v. Department of Defense*, 110 F. Supp. 3d 215, 228 (D.D.C. 2015) ("The work-product doctrine is not limited to those cases where litigation is a foregone conclusion.").  The key question is whether litigation is foreseeable by the individual who prepared the document, at the time that it was prepared: "[f]or a document to meet [the anticipation-of-litigation] standard, the lawyer must at least have had a subjective belief that litigation was a *real possibility,* and that belief must have been *objectively reasonable.*"  *Agility Public Warehousing Company K.S.C.*, 110 F. Supp. 3d at 228 (emphasis in original) (quoting *In re Sealed Case,* 146 F.3d at 884).  Here, Army has pointed to a specific investigative proceeding, involving a specific individual in the Army, concerning "the possibility of criminal prosecutions as a result of the investigation."  Second Swords Decl. ¶ 9b(iv).  It has further stated that the redacted portions reflect the agency counsel's communications regarding the possible criminal prosecutions, establishing that the counsel knew of the "real possibility" of litigation at the time that he wrote.  This specification thus carries the agency's burden, and Army may withhold portions of Army 95 pursuant to the work product privilege.[23]

But similar specificity is lacking for Army 81.  For this document, the withheld material

---

[23] Because "the protection offered by the [work product] doctrine 'is broader than the attorney-client privilege in that it is not restricted solely to confidential communications between an attorney and client," *Agility Pub. Warehousing Co. K.S.C.*, 110 F. Supp. 3d at 227 (quoting *Fed. Trade Comm'n v. Boehringer Ingelheim Pharms., Inc.,* 778 F.3d 142, 149 (D.C. Cir. 2015)), the Court will not assess Defendants' claim that attorney-client privilege also applies to Army 96.

appears in an email "from an attorney in the Department of Defense's Office of General Counsel to an attorney in the Department of the Army's Office of General Counsel seeking assistance with tracking investigations into allegations of detainee mistreatment and recommendations for how to respond to *anticipated* legal questions and *possible* litigation." Second Swords Decl. ¶ 9b(iii) (emphasis added). Rather than identify a particular investigative proceeding, Army relies on generalities coupled with the statement that "[c]ounsel anticipated the possibility of litigation." *Id.* But there is a difference between "possible litigation," *id.*, and the "*foreseeable* litigation" that the law demands to claim the privilege, *Schiller*, 964 F.2d at 1208. And in this instance, Army has not indicated in a nonconclusory fashion the investigative context that would establish a "real possibility" of litigation, *Agility Public Warehousing Company K.S.C.*, 110 F. Supp. 3d at 228 (emphasis omitted) (quoting *In re Sealed Case,* 146 F.3d at 884), at the time that the attorney prepared the material. Thus, without greater detail to establish more than the concern that "litigation might someday occur," *Senate of the Commonwealth of Puerto Rico*, 823 F.2d at 587, Army cannot rely on work product doctrine to withhold Army 81.

That said, the justification provided does permit the agency to partially withhold Army 81 pursuant to attorney-client privilege. Army's *Vaughn* Index specifies that the redacted portions of the document "reflect advice that was being sought as well as the recommendations provided" by the agency's counsel. Revised Updated Army *Vaughn* Index 31. Thus, this communication is clearly one "between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Cent., Inc.*, 566 F.2d at 252. In addition, Army affirms that the material was confidential, and that confidentiality has been preserved. *See* Second Swords Decl. ¶ 9b(iii) ("The legal opinions and recommendations withheld in Document 81 were made in confidence between agency counsel and their clients and have subsequently remained

confidential.").  This statement, in conjunction with the entry in its *Vaughn* Index and the

description of the communication's purpose in the declaration, carries Army's burden to

"demonstrate that confidentiality was expected in the handling of these communications,"

*Coastal States*, 617 F.2d at 863, and as such, Army has adequately justified its application of the

privilege.

However, Army has not similarly justified its withholding in full of Army 111.  Army

cannot rely on the attorney work product privilege here for the same reason that its justification

falls short with respect to Army 81: the prospect of litigation is not sufficiently clear.  In

discussing Army 111, Army does not identify any specific investigation, but instead states that

the "draft memorandum" "provides legal analysis, opinions, and recommendations regarding the

adoption of certain detainee interrogation techniques being considered by the Department of

Defense," and which the author, the Judge Advocate General, "anticipates will potentially be

subject to litigation in both international and domestic forums."  Second Swords Decl. ¶ 9a.  As

with Army 81, this speculative future prospect of possible litigation, without more, does not

suffice to establish that material is privileged pursuant to the work product doctrine.  And unlike

Army 81, Army cannot fall back on attorney-client privilege to withhold the document in full.

As stated previously, the attorney-client privilege is narrower than work product doctrine in the

sense that it covers only "confidential communications between an attorney and a client."  *Agility*

*Pub. Warehousing Co. K.S.C.*, 110 F. Supp. 3d at 227 (quoting *Boehringer Ingelheim Pharms.,*

*Inc.,* 778 F.3d at 149).   But here, neither the declaration nor the *Vaughn* Index states that all the

withheld portions of the document involve confidential attorney-client "communications"

"relating to a legal matter," *Mead Data Cent., Inc.*, 566 F.2d at 252, and as such, Army has not

adequately justified its withholding.

The Court thus finds the application of attorney-client privilege proper for Army 81 and Army 95, but finds Army's explanation inadequate for Army 111. In this case, the Court exercises its "broad discretion" regarding how best to redress Army's failure to meet its burden by ordering updated justification for Army 111, *Allen*, 636 F.2d at 1298, which Army may submit either in the form of new declarations or a revised *Vaughn* index, *see Vaughn*, 484 F.2d at 826–28.[24]

### b. *Deliberative Process Privilege and Attorney-Client Privilege*

For the remaining forty documents, Army justifies its withholdings pursuant to both the deliberative process privilege and the attorney-client privilege.[25] Army re-reviewed these documents before releasing its most recent *Vaughn* Index. *See* Second Swords Decl. ¶ 8. In support of its deliberative process claim, Army affirms that "[t]hese documents reflect the advice that was sought, and the opinions and recommendations that were given, regarding proposed policies and draft policy documents." *Id.* And in support of its attorney-client privilege claim, Army offers that "Army attorneys evaluated the proposed polices, reviewed the drafts they received, and provided their legal analysis, reviews, opinions and recommendations," which were "made in confidence and were not subsequently shared with individuals outside of the attorney-client relationship." *Id.* Defendants present any such overlap as unproblematic,

---

[24] To the extent that Army continues to rely on attorney work product privilege, it must provide more concrete detail about the litigation context for which the document was prepared. To the extent that Army rests instead on attorney-client privilege, it must indicate with greater precision why this privilege alone shields the document in full, including further detail concerning the confidentiality of the material within it. To the extent that Army relies on both privileges, it must indicate any portions of the document for which application of the privilege is not coterminous.

[25] These documents are: Army 21, Army 24, Army 34, Army 40, Army 41, Army 42, Army 43, Army 44, Army 45, Army 47, Army 48, Army 49, Army 50, Army 51, Army 52, Army 55, Army 56, Army 65, Army 66, Army 69, Army 70, Army 73, Army 74, Army 75, Army 76, Army 77, Army 78, Army 79, Army 86, Army 88, Army 89, Army 90, Army 91, Army 92, Army 93, Army 94, Army 98, Army 99, Army 107, Army 109.

asserting that "'the Court need not decide whether the[se] documents were [] properly withheld under the attorney-client privilege[,]' because the Army sufficiently demonstrated that they also properly withheld the information under the deliberative process privilege.'" Defs.' Mem. P. & A. Opp'n 26 n.5 (quoting *Judicial Watch v. U.S. Dep't of Justice*, 20 F. Supp. 3d 260, 276 (D.D.C. 2014)). Plaintiffs see it differently, contending both that the overlap matters because attorney-client privilege may "protect the secrecy of the underlying facts" in a way that the deliberative process privilege does not, and that, in any event, Army has not adequately justified its deliberative process withholdings. Pls.' Reply 14–15 (quoting *Mead Data Cent., Inc.*, 566 F.2d at 254 n.28); *see also* Pls.' Mem. 37 (challenging failure to explain why both privileges "apply, which privilege applies to which redactions, or where they overlap").

Plaintiffs have the better argument. Although Defendants are correct as a matter of law—an agency can simultaneously invoke both privileges, and in some cases, the Court need only make a determination as to one—their conclusion is incorrect. Because neither Army's declarations nor its *Vaughn* Index adequately indicate which privilege applies to which portions of the document, it has not in fact "sufficiently demonstrated" that its withholdings are proper pursuant solely to the deliberative process privilege. As the following discussion explains, the problem stems from the language that Army invokes and the manner in which it claims both privileges without any particularity as to which privilege applies to which portions of the document. This issue arises in several ways, which the Court will summarize before assessing why this approach is problematic, in context.

First, despite explicitly claiming both privileges, many of Army's justifications do appear to rely primarily on the deliberative process privilege—but without expressly stating that all redactions were applied pursuant to this privilege. In these instances, Army contends that the

redaction is justified because it "contains the opinions, recommendations, and suggestions of the authors regarding the proposed policies and reflect[s] the give-and-take of the consultative process." Revised Updated Army *Vaughn* Index 2 (discussing Army 21); *see also, e.g.*, *id.* at 4 (discussing Army 34); *id.* at 10 (discussing Army 47); *id.* at 11 (discussing Army 48); *id.* at 12 (discussing Army 49); *id.* at 42 (discussing Army 99); *id.* at 22 (discussing Army 70 and adding that other portions with "recommended responses" were withheld in part); *id.* at 3 (discussing redaction in Army 24 of "comment to client on draft policy"); *id.* at 7 (describing portions of Army 42 that "discuss the proposed policy"); *id.* at 44 (discussing redactions in Army 44 of "portions of email chain that reflected intra-agency deliberations regarding [] comments and recommendations" on a proposed draft). There are numerous other, similar examples in the *Vaughn* Index. At times, the entry for a record also states that the document is "predecisional," *see id.* at 2 (characterizing Army 21 as a "predecisonal draft memorandum"); more often, Army implies the document's predecisonal status, *see, e.g.*, *id.* at 7 (referring to recommendations on a draft DODI and then referencing the final version of the DODI for Army 41); *id.* at 33–34 (similar discussion of Army 86 and Army 88, respectively). One logical read of this language, which invokes the words associated with deliberative process privilege, is that Army claims only this privilege to justify all of these redactions. But because Army's submissions simultaneously invoke attorney-client privilege, without specifying the portions of the document covered by either privilege or stating that all the redacted material is protected by the deliberative process privilege and the attorney-client privilege (*e.g.*, that application of the privileges is coterminous), the Court cannot be certain.

Moreover, although Defendants imply that the deliberative process privilege standing alone supports the withholdings in all of these documents, *see* Defs.' Mem. P. & A. Opp'n 26

n.5, other entries in the *Vaughn* Index create doubt as to whether this privilege alone covers all the withholdings.  For some of the documents, the justificatory language itself mixes the deliberative process and attorney-client legal standards in a way that creates ambiguity around Army's rationale.  Take Army 43, for which Army "redacted portions of [an] email exchange reflecting legal advice and recommendations."  Revised Updated Army *Vaughn* Index 8.  At no point does Army establish which portions were redacted because of their status as opinions and recommendations (deliberative process privilege), or whether the same or different portions were redacted because of their status as legal advice or recommendations (attorney-client privilege).  Or consider, as another representative example, Army 45, a set of emails in which attorneys from Army and "other military branches" provided "legal advice" to the Assistant Secretary of Defense (Health Affairs).  *Id.* at 9.  For this document, Army "redacted portions of draft predecisional inter/intra agency communications between the client and agency counsel commenting on the proposed response" to a report by the Council on Ethical and Judicial Affairs on the grounds that the redacted portions "contain the opinions, recommendations, and suggestions of the authors regarding the proposed policies and reflect the give-and-take of the consultative process."  *Id.* at 9; *see also id.* at 13 (describing redactions in Army 50 of "communications between agency counsel and client commenting on" an attached draft policy); *id.* at 37–40 (describing similar redactions in Army 91, Army 92, and Army 93 of "recommendations and other comments in an email chain between agency counsel and client on [a] draft policy," as well as almost identical language concerning Army 94), *id.* at 13, 26, 35, 44 (discussing redacted portions of Army 51, Army 75, Army 89, and Army 109, respectively, that consist of "communications between agency counsel and client"); *id.* at 18–19, 21, 36 (similar justifications for redactions in Army 65, Army 66, Army 69, and Army 90 of "legal opinions

regarding" Army's "proposed response to Dr. Winkwerder's Staffing of a proposed health care personnel policy"); *id.* at 24–29 (similar language concerning Army 73, Army 74, Army 76, Army 77, Army 78, and Army 79, respectively, and the redaction therein of portions of email communications between agency counsel and the client, including references to "legal opinions," "legal and other comments," or "legal recommendations" ); *id.* at 42 (similar language regarding redaction in Army 98 of "legal advice" on draft document).  For some of these documents, moreover, Army has withheld in full an attached document, without explicitly specifying which privilege applies to it, and on what basis.  *See, e.g.*, *id.* at 6 (Army 40); *id.* at 14 (Army 52); *id.* at 21 (Army 69); *id.* at 22 (Army 70).

Furthermore, for still other documents, the language of the *Vaughn* Index suggests even more strongly that Army—notwithstanding Defendants' argument that solely the deliberative process privilege suffices to justify all redactions, *see* Defs.' Mem. P. & A. Opp'n 26 n.5—relied in part on deliberative process and in part on attorney-client privilege.  For an illustrative example, consider Army 107, which Army describes as a "[d]eliberative and advisory document prepared by legal counsel for the client prior to an agency decision" and as a "legal opinion" before explaining that it "redacted *portions* of [a] memorandum that consist of recommendations and other comments on the draft FM [2-22.3]."  Revised Updated Army *Vaughn* Index 44 (emphasis added); *see also id.* at 17 (stating that, for Army 17, Army "redacted portions of email communications between agency counsel and client" and also "redacted discussion, analysis, and proposed recommendations on [a] draft version" of a Detainee Ethics Memo); *id.* at 33 (similar language for Army 86 redactions).  The trouble is that this mixture of deliberative process and attorney-client privilege language makes it confusing, if not impossible, to discern which privilege has been applied with respect to which withholdings.

As Plaintiffs rightly argue, this uncertainty about which privilege applies to a particular withholding has real stakes.  The two privileges often overlap, yet they are not identical: attorney-client privilege covers the underlying factual material associated with an attorney's provision of legal advice, whereas the "deliberative process privilege directly protects advice and opinions and does not permit the nondisclosure of underlying facts unless they would indirectly reveal the advice, opinions, and evaluations circulated within the agency as part of its decision-making process."  *Mead Data Cent., Inc.*, 566 F.2d at 254.  Accordingly, without more specific detail as to which parts of which documents are withheld under which privilege, Army has not carried its burden to justify application of either privilege.  *See Pronin*, 2019 WL 1003598, at *3 (establishing that an agency seeking to invoke an exemption must "describe the requested documents and 'the justifications for nondisclosure with reasonably specific detail.'" (quoting *Larson*, 565 F.3d at 862)).  Even if the invocation of deliberative process privilege alone justifies at least some of Army's redactions—which the Court does not decide at this juncture—it is not clear that *all* of the redactions are proper under this privilege.  Thus, the Court directs Army to submit supplemental material to clarify which privilege it is claiming for each portion of these forty challenged documents, at which point it will determine whether Army's justification for applying either one or both of these privileges is adequate.[26]

---

[26] This path is also most appropriate because the filings do not provide the information that is necessary to find that attorney-client privilege applies; notably, many of the *Vaughn* Index entries mention the involvement of attorneys, but fail either to establish the confidentiality of the communication or to establish with specificity that "obtaining or providing legal advice [was] a primary purpose of the communication, meaning one of the significant purposes of the communication."  *In re Kellogg Brown & Root, Inc.*, 756 F.3d at 760.  Thus, the Court orders Army to, in any such supplementation: (1) clarify whether its invocation of deliberative process privilege and attorney-client privilege are coterminous in a given document; (2) explain, to the extent that attorney-client privilege alone shields any portion of the document, how that communication originally involved confidential information provided by the client, what specific

### 5. Segregability

As previously discussed with regard to Defendants' renewed motion for partial summary judgment, before addressing the exemptions claimed by the other Defendant agencies, the Court must assess one final matter concerning Defendant Army's claimed exemptions: segregability.[27] *See Sussman*, 494 F.3d at 1117 (discussing district court's duty to consider segregability). Again, FOIA requires an agency invoking an exemption to disclose any reasonably segregable, non-exempt information. *See Prop. of the People, Inc.*, 330 F. Supp. 3d at 380 (quoting *Competitive Enter. Inst.*, 232 F. Supp. 3d at 181); *see also* 5 U.S.C. § 552(b). "To meet its burden on segregability, a government agency usually must submit a sufficiently detailed *Vaughn* Index for each document and an affidavit or declaration stating that it has released all segregable material." *Bloche II*, 370 F. Supp. 3d at 55 (citing *Johnson*, 310 F.3d at 776).

The parties in this case disagree as to whether Army has met this burden. In addition to generally challenging Army's "over-withholding of information," Pls.' Reply 22, Plaintiffs argue that Army has failed to segregate and disclose non-exempt material for its deliberative process privilege claims and "has provided no explanation for why segregable information has not been

_____

legal advice was sought, and how the confidentiality of the material has been preserved; and (3) establish, to the extent that deliberative process privilege alone shields any portion of the document, what specific policy decision was at issue and how that deliberative process was predecisional to a final agency determination (including a choice not to act).

[27] This Court will address segregability only with respect to the documents for which Army has provided adequate justification, as detailed above. Thus, the Court reserves discussion of the segregability of the following documents, for which Army's *Vaughn* Index and declarations provide insufficient explanations: Army 21, Army 24, Army 25, Army 26, Army 34, Army 40, Army 41, Army 42, Army 43, Army 44, Army 45, Army 47, Army 48, Army 49, Army 50, Army 51, Army 52, Army 55, Army 56, Army 63, Army 64, Army 65, Army 66, Army 69, Army 70, Army 73, Army 74, Army 75, Army 76, Army 77, Army 78, Army 79, Army 86, Army 88, Army 89, Army 90, Army 91, Army 92, Army 93, Army 94, Army 98, Army 99, Army 107, Army 109, Army 111, Army 112, and Army 113.

released." Pls.' Mem. 27; *see also id.* at 38 ("Army has provided no explanation for why the redacted documents [to which it applied both the deliberative process and attorney-client privilege] do not contain segregable information.").  In support of this argument, Plaintiffs point to documents such as Army 46, a policy memorandum, and assert that such a document "must include background and factual information that is not deliberative in nature." *Id.* at 28.  Along similar lines, Plaintiffs contend that Army 72, which includes a PowerPoint presentation on a proposed draft of FM 2-22.3 prepared for a "Familiarize Brief," is "extremely likely" to "contain factual information and information on current policies in order to contextualize the proposed changes." *Id.*  In response to Plaintiffs' objections, Army updated its *Vaughn* Index entries, with "[p]articular attention . . . paid to the ten documents which were previously withheld in full." Second Swords Decl. ¶ 5.  Major Swords states that he "re-reviewed" these ten documents, nine of which relate to FM 2-22.3, and determined that one (Army 61) could be released in full and that "there was no reasonably segregable, non-exempt information that could be released in the remaining nine documents" based on his "line-by-line review."  Second Swords Decl. ¶ 10.

But there are two fundamental problems with Army's reliance on these submissions to establish that it has satisfied its segregability burden.  First and foremost, this declaration addresses the nine wholly withheld documents with specificity, yet it never discusses Army's review of the other documents to which it applied FOIA exemptions.  Nor does Army's first declaration include any statement that Army has released all segregable information.  To be sure, by detailing the manner in which Army applied the deliberative process privilege, *see* Swords Decl. ¶ 7, Army invites the Court to infer that this is the case.  But as in its March 2019 memorandum opinion, "the Court declines this invitation; courts typically require sworn declarations or affidavits to avoid such conjecture."  *Bloche II*, 370 F. Supp. 3d at 56.  Thus,

Army has not established that there is no further, reasonably segregable information in its partially withheld documents.

Second, there is a flaw in the justification for the fully withheld documents: it is not obvious which "ten documents" are referenced. On the Court's count, the *Vaughn* Index on which Army presently relies to justify its withholdings lists twelve documents that remain withheld in full: Army 15, Army 16, Army 20, Army 22, Army 25, Army 26, Army 62, Army 63, Army 64, Army 111, Army 112, Army 113. *See* Revised Updated *Vaughn* Index. Thus, the Court cannot pinpoint which documents are referenced in Army's second declaration, which makes it impossible to identify with certainty which documents Major Swords re-reviewed in his segregability analysis. Army must therefore, for all documents, re-review its withholdings, produce any remaining, non-exempt segregable material that remains withheld, and submit a sworn statement to confirm that all segregable material has been released for all partially and wholly withheld documents. Until such time, Army has not satisfied what FOIA requires to withhold information in any of the sixty-nine challenged documents.

As the Court previously mentioned, in addition to challenging these documents withheld in part or in full by Defendant Army, Plaintiffs contest the exemptions applied to nine documents by four other Defendant agencies: SOCOM 8, DIA 9-12, CENTCOM 1-9, CENTCOM 23-25, CENTCOM 36-49, JTF-GTMO 4-16, JTF GTMO 52-66, JTF-GTMO 78-90, and JTF-GTMO 94-95. Beginning with Defendant SOCOM, the Court will next discuss these documents.

## B. SOCOM

Plaintiffs challenge the withholding of information in SOCOM 8 pursuant to the deliberative process privilege, which, as previously discussed, requires Defendants to show that the withheld information is both predecisional and deliberative. *See Prop. of the People*, 330 F.

Supp. 3d at 382. SOCOM 8 is a single page in a "38-page slide presentation from December 2005 by the Deputy Director of SOCOM's Psychological Applications Directorate concerning then-current applications of operational psychology." Defs.' Mot. Partial Summ. J. Ex. H, Declaration of Mark H. Herrington ("Herrington Decl.") ¶ 6, ECF No. 96-9; *see also* Defs.' Mem. P. & A. Opp'n 22 (citing Herrington Decl. ¶ 6). The redacted page in the slide presentation discusses "repatriation lessons learned" and involves the author's analysis of "how best to meet the psychological needs of U.S. prisoners of war when they are rescued and returned home." Herrington Decl. ¶ 6. The specific information that SOCOM has withheld consists of "comments provided in 2003 by a soldier who was a prisoner of war during Operation Iraqi Freedom," which SOCOM states consists of this soldier's "opinions, advice, and recommendations." *Id.* Plaintiffs contest these withholdings as neither predecisional nor deliberative. First, Plaintiffs argue that the comments are not predecisional to "the document's context[:]" "current agency application." Pls.' Mem. 30. Plaintiffs also maintain that the comments, which were made two years before the slide presentation was created, are "no longer predecisional" "[t]o the extent that the agency ha[s] chosen to adopt them, or decisionmakers incorporated them into the final policy." *Id.* Second, Plaintiffs contend that SOCOM "has failed to specifically describe the role this information played" in its decisionmaking. *Id.* at 31. Defendants counter that this argument misconstrues the relevant decisionmaking context: "SOCOM's 'consideration of improvements in the repatriation process' for U.S. service members who were prisoners of war." Defs.' Mem. P. & A. Opp'n 23 (quoting Herrington Decl. ¶ 6). As such, Defendants assert that the soldier's opinions and recommendations are both predecisional and deliberative, and thus properly privileged. *Id.*

Without more specificity about the decisionmaking timeline and context, however, SOCOM has failed to carry its burden concerning application of the privilege. To qualify as deliberative and hence subject to the privilege requires, "in essence, that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue." *Nat'l Sec. Archive*, 752 F.3d at 463 (citing *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982)). Here, SOCOM has not explained how, exactly, the comments from 2003 contributed to the agency's deliberative process concerning a final position on the relevant issue. SOCOM does state a general policy justification for the withholding, explaining that "[d]ebriefings of former U.S. prisoners of war are kept in confidence to ensure full disclosure and to avoid service personnel withholding information for fear of embarrassment." Herrington Decl. ¶ 6. But this overarching policy rationale does not connect the 2003 comments up to a deliberative process culminating in a final agency position on how to improve the repatriation process for former prisoners of war.

This lack of detail is especially problematic, moreover, because "application of the deliberative process privilege is context-specific." *Hardy*, 243 F. Supp. 3d at 168 (quoting *Edmonds Inst. v. U.S. Dep't of Interior*, 460 F. Supp. 2d 63, 70 (D.D.C. 2006)); *see also Coastal States*, 617 F.2d at 867 (stating that the applicability of the privilege depends on the role that information "plays in the administrative process"). On the submissions provided, the Court lacks the information it needs to evaluate SOCOM's application of the privilege, in context. The key problem, put simply, is that SOCOM does not say anything about how or why the comments were gathered in 2003. Were they provided as part of an earlier policymaking initiative or decision point, or were they collected as part of the same deliberative process to which the 2005 presentation contributed? Or, in the alternative, were they gathered as part of the individual's

debriefing, and then subsequently applied to inform an agency policy evaluation? Without knowing more, the Court cannot ascertain what role, if any, the redacted communication played in facilitating or assisting development of the agency's final position on the matter. And as such, it cannot ascertain whether the redacted comments are deliberative in the manner that the privilege requires. Nor does SOCOM clarify the role of the 2005 presentation in which the redacted comments appear vis-à-vis the agency's deliberative process concerning the same issue. This lack of specificity makes it all the more difficult to determine the role of the comments with respect to the "frank exchange of ideas and opinions," *Nat'l Sec. Archives*, 752 F.3d at 462 (quoting *Dudman Comm'ns*, 815 F.2d at 1567), required to formulate the agency's final position. It is possible that the material is in fact privileged. But on the material provided, SOCOM's justification is insufficient to allow the Court to draw any firm conclusions. Thus, to the extent that SOCOM continues to rely on the deliberative process privilege to withhold the material, the Court directs SOCOM to submit a supplementary declaration or affidavit that provides this missing information.[28]

### C. DIA

A single document is also at issue with respect to Defendant DIA, which has withheld in full a four-page trip report, DIA 9-12. Defs.' Mot. Partial Summ. J. Ex. C, Declaration of Alesia Y. Williams in Support of Defendants' Motion for Summary Judgment ("Second Williams

---

[28] Until such time, the Court reserves the question of whether the material has been properly segregated. SOCOM's supplementation must clarify: (1) the agency decision or deliberative process for which the comments were gathered in 2003, and how that context relates to the context in which the 2005 presentation was delivered, and (2) whether any portion of the 2003 advice and recommendations was implemented as SOCOM's final policy between the time that the comments were provided and delivery of the 2005 presentation.

Declaration") ¶¶ 8–20, ECF No. 96-4.[29]  This document is a "written summary of a trip taken" in late 2002 and early 2003 to "assess DoD interrogation at Guantanamo Bay."  *Id.* ¶ 8.  DIA justifies the withholding by invoking three FOIA exemptions: it shielded (1) "certain information in DIA 9-12" under FOIA Exemption 1 because it "relates to intelligence sources and methods," *id.* ¶ 12; (2) "certain information in DIA 9-12" under FOIA Exemption 3 because it "specifically identif[ies] the names of DIA personnel, specific DIA office symbols, and specific DIA activities," release of which would contravene 10 U.S.C. § 424; and (3) "certain information from DIA 9-12" under FOIA Exemption 5 because it "constitutes an intra-government agency communication that includes recommendations relating to interrogation TTPs" based on the author's "experiences and observations," *id.* ¶ 20.  Plaintiffs do not contest DIA's Exemption 3 withholdings "to the extent they are not being used to withhold the document in full."  Pls.' Reply 24 (citing Pls.' Mem. 21).  Plaintiffs do, however, challenge DIA's withholding in full on the grounds that "it is impossible for Plaintiffs to know how much has been withheld under each exemption."  Pls.' Mem. 21.  Thus, Plaintiffs argue that," "[e]ven if all three of these Exemptions adequately apply to specific sections of the document," it is not possible to draw this conclusion without knowing "which Exemptions apply to which sections."  Pls.' Reply 24.

In this case, for reasons similar to those outlined previously with respect to Defendant Army's concurrent deliberative process and attorney-client privilege withholdings, the Court agrees with Plaintiffs.  Neither the declaration provided nor DIA's *Vaughn* Index, *see* Pls.' Mem. Ex. C, *Vaughn* Index to the Declaration of Alesia Y. Williams, ECF No. 97-5, indicates which portions of the document were redacted pursuant to which privilege.  The *Vaughn* Index,

---

[29] The initial Williams Declaration discusses the documents contested in Defendants' renewed motion for partial summary judgment, *see* ECF No. 110, addressed previously in this opinion.  The instant declaration was provided in 2018 and concerns the documents at issue in the parties' pending cross-motions for summary judgment.  *See* ECF Nos. 96, 97.

confusingly, makes no mention of Exemption 5 in discussing DIA 9-12. *See id.* DIA instead offers a blanket reference to "certain information" in justifying each exemption. *See* Second Williams Decl. ¶¶ 8, 12, 20. Nor do DIA's submissions at any point state whether any single privilege would shield the document in full. It is easy to intuit which portions were redacted pursuant to Exemption 3, yet this is not the case for Exemptions 1 and 5, which—on the information provided—may have been applied to distinct parts of the document. Until DIA clarifies whether it applied Exemption 1 and Exemption 5 to the same or different portions of DIA 9-12, it is premature for the Court to draw conclusions as to whether the document is properly withheld. Thus, the Court directs DIA to submit a supplementary affidavit or declaration that states which portions of DIA 9-12 were withheld pursuant to which FOIA exemption, whereupon it will determine the adequacy of DIA's justifications as well as whether it has properly segregated all non-exempt material.

### D. CENTCOM

Plaintiffs contest Defendant CENTCOM's redaction of portions of three documents pursuant to Exemption 1: CENTCOM 1-9, CENTCOM 23-35, and CENTCOM 36-49. Because the Court has not yet discussed what an agency must establish to apply Exemption 1, it will set forth the applicable legal standard before assessing whether CENTCOM may partially withhold these documents. For the following reasons, CENTCOM has carried its burden here and may apply Exemption 1 to shield portions of these three documents.

#### 1. Exemption 1

FOIA Exemption 1 "protects material that is (1) "specifically authorized under criteria established by an Executive order to be kept secret in the interests of national defense or foreign policy" and (2) "in fact properly classified pursuant to such [an] Executive order." 5 U.S.C. §

552(b)(1); *see also Larson*, 565 F.3d at 861 (quoting 5 U.S.C. § 552(b)(1)).  For an agency to

withhold material under Exemption 1, the information at issue "must be classified in accordance

with the procedural criteria of the governing Executive Order as well as its substantive terms."

*Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 483 (D.C. Cir. 1980).  The basis for classification of

national security information that is relevant here is located in Executive Order 13,526 ("EO

13,526").  *See* Defs.' Mot. Partial Summ. J. Ex. J., Declaration of Major General Michael Erik

Kurilla ("Kurilla Decl.") ¶ 8, ECF No. 96-11.

Under EO 13,526, four conditions are required to establish that information has been

properly classified: (1) "an original classification authority is classifying the information;" (2)

the United States Government owns or controls the information, or the information was produced

by or for the Government; (3) "the information falls within one or more of the categories of

information listed in section 1.4" of EO 13,526; and (4) "the original classification authority

determines that the unauthorized disclosure of the information reasonably could be expected to

result in damage to the national security" and "is able to identify or describe the damage."  Exec.

Order 13,526, 75 Fed. Reg. 707, 707 (Dec. 29, 2009); *see also Elec. Privacy Info. Ctr. v. U.S.

Dep't of Justice*, 296 F. Supp. 3d 109, 124 (D.D.C. 2017) (discussing EO 13,526).  Section 1.4 of

EO 13,526 identifies eight categories of information that "could reasonably be expected to cause

identifiable or describable damage to the national security[,]" including, as relevant here,

information pertaining to "military plans, weapons systems, or operations" or "intelligence

activities (including covert action), intelligence sources or methods, or cryptology."  Exec. Order

13,526, 75 Fed. Reg. at 709.  "Thus, if information that is responsive to a FOIA request fits into

any of the eight categories, and if an original classifying authority has designated the information

classified based on that authority's determination that the unauthorized disclosure of the

information reasonably could be expected to result in damage to the national security, the information has properly been deemed 'classified' and the government can invoke Exemption 1 to withhold the information from disclosure under the FOIA." *Elec. Privacy Info. Ctr.*, 296 F. Supp. 3d at 124–25 (citing *Larson*, 565 F.3d at 864).

As with all FOIA exemptions, an agency that withholds information pursuant to Exemption 1 bears the burden of justifying its decision. *King*, 830 F.2d at 217 nn.57–58 (citing 5 U.S.C. § 552(a)(4)(B)). The agency must, as with all FOIA exemptions, put forth a justification for invoking the exemption that "appears logical or plausible." *Dillon*, 2019 WL 249580, at *8 (quoting *Wolf*, 473 F.3d at 374–75)). That said, the national security context is unique, and courts in this Circuit have "consistently deferred to executive affidavits predicting harm to the national security[] and have found it unwise to undertake searching judicial review." *Nat'l Sec. Counselors v. Cent. Intelligence Agency.*, 960 F. Supp. 2d 101, 164–65 (D.D.C. 2013) (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 927 (D.C. Cir. 2003)); *see also James Madison Project v. Cent. Intelligence Agency*, 605 F. Supp. 2d 99, 109 (D.D.C. 2009) (citing *Schlesinger v. Cent. Intelligence Agency*, 591 F. Supp. 60, 67 (D.D.C. 1984), then citing *Halperin v. Cent. Intelligence Agency*, 629 F.2d 144, 148 (D.C. Cir. 1980)). Courts are thus to "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record," while taking into account the reality "that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm." *Am. Civil Liberties Union v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011) (quoting *Wolf,* 473 F.3d at 374).

## 2. Defendant's Application of Exemption 1

In this case, CENTCOM both affirms that the material is properly classified and states that it is properly withheld under Section 1.4(a) and 1.4(c) of EO 13,526. *See* Kurilla Decl. ¶¶ 8–10. This information is classified at the SECRET level, "including records labelled SECRET//NOFORN (which prohibits even foreign coalition partners from viewing the records)." *Id.* ¶ 8. CENTCOM states that material redacted on one page of CENTCOM 1-9, one page of CENTCOM 23-35, and four pages of CENTCOM 26-39 concerns "document titles and procedures related to interrogation." *Id.* ¶ 11 (discussing redactions at "bates numbered pages[] 3, 25, 40, and 45-47"). It submits that "[d]ivulging these procedures would provide future potential detainees with invaluable insight into interrogation operations[,] enabling them to overcome techniques to extract vital intelligence." *Id.*; *see also* Pls.' Mem. Ex. K, CENTCOM *Vaughn* Index 2–3, ECF No. 97-13.[30]

The CENTCOM *Vaughn* Index adds further detail regarding each document. For CENTCOM 1-9, "[t]he redacted information would reveal tactics, techniques, and procedures (TTPs) for collecting and assessing intelligence information[] and reviewing intelligence and operational plans." CENTCOM *Vaughn* Index 2. For CENTCOM 23-25, "[t]he redacted information would reveal interrogation methods and approaches by personnel involved in assessing detainees and intelligence processes." *Id.* at 3. And for CENTCOM 26-49, the redacted information would reveal not only "interrogation methods and approaches," but also "operational plans when other countries are involved." *Id.* Thus, CENTCOM asserts that it has

---

[30] Because this document is not paginated, the Court refers to it here and throughout this opinion with the ECF page numbers.

withheld this information as properly shielded by Section 1.4(a).[31] CENTCOM also states that it withheld material located within CENTCOM 1-9 pursuant to Section 1.4(c) because it "relates to intelligence-gathering efforts, methods, and results," the disclosure of which would also risk giving "future potential detainees" "invaluable insight" that would "enable[e] them to overcome techniques to extract vital intelligence." Kurilla Decl. ¶ 12 (discussing challenged withholding "located on bates numbered page[] 3"). The information withheld on this basis is the same information withheld under Section 1.4(a). *See* Defs.' Mem. P. & A. Supporting Renewed Mot. 8.

Plaintiffs do not argue that the challenged information is improperly classified, but rather contest the sufficiency of CENTCOM's justifications. Plaintiffs assert that "CENTCOM does not make clear how each" of the "particular documents" at issue "would in fact harm national security if released," Pls.' Mem. 18, in the manner required to sustain its Exemption 1 claim. In particular, Plaintiffs contest CENTCOM's repeated reliance on a "blanket statement" that these documents could provide "'invaluable insight into interrogation operations,' without explaining how or why." *Id.* at 18–19. Without more, Plaintiffs press the Court to deem "CENTCOM's broad justification . . . too conclusory to satisfy the Exemption 1 plausible and logical standard" and to conduct *in camera* review. Pls.' Reply 8.

The Court agrees that CENTCOM's justifications are terse. Contrary to Plaintiffs' contentions, however, its submissions are sufficiently detailed to establish that the withheld portions logically and plausibly fall within Exemption 1's protections for classified material. The titles of each of the documents contextualize CENTCOM's justifications: CENTCOM 1-9 is "an appendix to the Behavioral Science Consultation Team Standard Operation Procedures," and

---

[31] Although the *Vaughn* Index also discusses Section 1.4(c) with respect to CENTCOM 36-49, because the declaration does not, the Court focuses only on 1.4(a) here.

both CENTCOM 23-25 and CENTCOM 36-49 are "Multi-National Force-Iraq Interrogation Policy" documents. Kurilla Decl. ¶ 6. Based on these titles and the SECRET level of classification for "document titles and procedures related to interrogation" contained in these documents, it strikes the Court as logical and plausible that the documents contain "details of practices associated with interrogation," the disclosure of which would risk undermining the future viability of techniques relied upon "to extract vital intelligence." *Id.* at 11. As Defendants put this point, drawing from the Kurilla Declaration: "it is both logical and plausible that disclosure of information pertaining to the military's interrogation methods reasonably could be expected to harm the national security by providing 'future potential detainees with invaluable insight into interrogation operations,' which would 'enable[e] them to overcome [the military's interrogation] techniques[,]' thereby diminishing the military's ability to 'extract vital intelligence' from adversaries." Defs.' Mem. P. & A. Opp'n 9 (quoting Kurilla Decl. ¶ 12). The Court is hard-pressed to say how CENTCOM could explain "how or why" release of the documents would harm national security interests, Pls.' Mem. 18–19, with any greater specificity, without risking disclosure of the classified techniques themselves. Nor do Plaintiffs suggest what, exactly, is missing from the CENTCOM submission, beyond resting on the allegation that it is too conclusory and repetitive.

CENTCOM has thus met its "light" burden, *Am. Civil Liberties Union*, 628 F.3d at 624, to establish a risk of a particular category of harm articulated in section 1.4 of EO 13,526 with respect to the release of properly classified information, such that it may properly invoke Exemption 1. CENTCOM also submits, via sworn affidavit, that its FOIA Office conducted a "line-by-line" review of each record and, "with respect to the records that were released in part, all information not exempted from disclosure pursuant" to an exemption "was correctly

segregated and non-exempt portions were release[d]." Kurilla Decl. ¶ 17.  Thus, CENTCOM has satisfied what FOIA requires and may partially withhold CENTCOM 1-9, CENTCOM 23-35, and CENTCOM 36-49 pursuant to Exemption 1.

### E.  JTF-GTMO

The final matter before the Court in the parties' cross-motions for partial summary judgment is Defendant JTF-GTMO's application of FOIA exemptions.  Plaintiffs contest the partial withholding of JTF-GTMO 4-16, JTF-GTMO 52-66, JTF-GTMO 78-90, [32] and JTF-GTMO 94-95 pursuant to Exemption 7(E) and Exemption 1.  *See* Updated History of Disputed Docs. 6.  Because JTF-GTMO claims Exemption 7(E) as the basis for withholding most of the redacted information in JTF-GMTO 4-16 and JTF-GTMO 52-66, *see* Defs.' Mot. Partial Summ. J. Ex. I-1, ECF No. 96-10 (redacted versions of documents), the Court begins there. [33]

Before proceeding with this analysis, however, the Court will attempt to clarify what, exactly, is contested at this juncture, and how it relates to the parties' submissions.  JTF-GTMO has provided redacted versions of the documents, and Defendants explain how some—but critically, not all—of the documents that Plaintiffs challenge are included in the material that JTF-GTMO attached to its declaration as Exhibit 1.  Defendants state that "the pages released to Plaintiffs as GTMO 4-16 and GTMO 78-90 appear as GTMO 001-0013 in Exhibit 1" and "the

---

[32] Because both parties acknowledge that JTF-GTMO 78-90 is a duplicate of JTF-GTMO 4-16, Defs.' Mot. Partial Summ. J. 15 (citing Ring Decl. ¶ 5); Pls.' Mem. 15, the Court does not separately address it.

[33] In contrast to the exemptions applied by the other Defendants, because JTF-GTMO has provided three of the redacted documents as an exhibit attached to its declaration, it is evident where these exemptions are coterminous and where they apply to different portions of a document.  *See* Defs.' Mot. Partial Summ. J. Ex. I-1, ECF No. 96-10.  On the Court's read of these documents, JTF-GTMO has applied Exemption 7(E) to all redacted portions of JTF-GTMO 4-16 and JTF-GTMO 52-66 for which it also applied Exemption 1.  For the reasons detailed below, it cannot assess whether this is also the case for the other redactions at issue.

pages released to Plaintiffs as GTMO 52-66 appear as GTMO 0023-0037." Defs' Mem. 15 n.5.

This explanation leaves the Court with two puzzles. First, although Plaintiffs indicate that they

challenge the partial withholding of JTF-GTMO 94-95, there is no mention of it in either of the

parties' filings apart from the entry in Plaintiffs' history of disputed documents—nor does

Defendants' exhibit appear to include it. Based on JTF-GTMO's declaration and *Vaughn* Index,

it is possible that this document is a duplicate of JTF-GTMO 52-66. *See* Ring Decl. ¶ 5

(discussing the release of the document "redactions in 2008, at which time duplicates of the same

document were released with bates-stamped pages 17-18 and 94-95"); JTF-GTMO *Vaughn*

Index 5, ECF No. 97-10[34] (indicating that the document is a duplicate). But because the *Vaughn*

Index entry is most similar to the one for JTF-GTMO 78-90, *see* JTG-GTMO *Vaughn Index* 5,

the Court is not certain whether it is a duplicate of that document, which is itself a duplicate of

JTF-GMTO 4-16. Without clarification concerning what other record this document duplicates

and—if it is different from one of the other contested documents—what justification applies to

the redactions within it, the Court cannot determine whether JTF-GTMO has carried its burden

regarding JTF-GTMO 94-95. To the extent that JTF-GTMO continues to withhold information

in either of these documents, it must submit further supplementation clarifying the basis for its

withholdings in GTMO 94-95.[35]

Second, a similar ambiguity plagues another aspect of JTF-GTMO's submissions.

Although the exhibit containing redacted documents contains a third document, located at Bates

---

[34] Because this document is not paginated, the Court refers to it with the ECF page numbers.

[35] Although Plaintiffs do not make any arguments concerning this withholding, because the agency bears the burden of showing that the privilege properly applies, *see Dillon*, 2019 WL 249580 at *8 (citing *Prop. of the People*, 330 F. Supp. 3d at 380), and because Plaintiffs appear to challenge it, JTF-GTMO must offer a "relatively detailed justification" of its application of the privilege, *Elec. Privacy Info. Ctr.*, 192 F. Supp. 3d at 103 (quoting *Mead Data Cent., Inc.*, 566 F.2d at 251), before the Court can say whether JTF-GTMO has carried its burden.

numbered pages 0014 and 0015, *see* Defs.' Mot. Partial Summ. J. Ex. I-1, ECF No. 96-10 at 23–24,[36] and the Ring Declaration discusses this document, neither party explains how these pages correspond to a contested document.  The Ring Declaration itself states that it refers to documents "by the page numbers associated with their 2008 and 2018 releases, which are the page numbers utilized by Plaintiffs' Consolidated Spreadsheet of Insufficient Document Productions from Defendant Agencies," Ring Decl. ¶ 5, which was attached to the parties' May 18, 2018 Joint Status Report, *see* ECF No. 90-1.  But this spreadsheet does not include any document that corresponds to these Bates numbers.  Nor does Plaintiffs more recent submission of the documents it continues to challenge discuss these Bates numbers.  *See* Updated History of Disputed Docs.  Thus, because the Court cannot link up the justifications and exhibit provided to an identifiable document that remains contested, it cannot determine the propriety of JTF-GTMO's redactions on these Bates numbered pages.  It is to prevent exactly this sort of difficulty that government agencies often rely on *Vaughn* indices in the first instance.  *See Vaughn*, 484 F.2d at 827 ("The need for adequate specificity is closely related to assuring a proper justification by the governmental agency.").  To clear up this issue, the Court directs the parties to indicate whether the material located at Bates numbered pages 0014-0015 remains challenged and how the document is identified.  If Plaintiffs do in fact contest this material, then JTF-GTMO must pinpoint its justification for the withholdings therein, whereupon the Court will assess whether these justifications are adequate.

Turning back to JTF-GTMO 4-16 and JTF-GTMO 52-66, for the reasons set forth below, JTF-GTMO has not provided sufficient explanation for its invocation of Exemption 7(E).

---

[36] Because these documents have been paginated multiple times, to avoid confusion, the Court refers here to the ECF page numbers as the authoritative source.

### 1. Exemption 7(E)

As discussed previously with respect to Defendants' renewed motion for partial summary judgment, ECF No. 110, an agency seeking to apply Exemption 7(E) must (1) demonstrate that the "records or information" were "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7)(E), and (2) "demonstrate logically how the release of the requested information might create a risk of circumvention of the law," *Mayer Brown LLP*, 562 F.3d at 1193–94. In assessing the risk of circumvention of the law, this Circuit has emphasized the "relatively low bar," *Blackwell*, 646 F.3d at 42, that the agency must clear: "the exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Mayer Brown LLP*, 562 F.3d at 1193. That said, to meet even this low bar, the agency must "demonstrate logically how the release of the requested information might create a risk of circumvention of the law," *id.* at 1194, in a nonconclusory fashion that does more than "essentially just restate[] the applicable legal standard in different words," *see Bloche II*, 370 F. Supp. 3d at 58.

### 2. Defendant's Application of Exemption 7(E)

Again, JTF-GTMO applied Exemption 7(E) to all of the redactions in JTF-GTMO 4-16 and JTF-GTMO 52-66. Because JTF-GTMO's *Vaughn* Index does not discuss the application of Exemption 7(E) to either document—only the application of Exemption 1 and other exemptions not at issue here—the Court relies on the justification provided in the Ring Declaration. JTF-GTMO 4-16 is a document entitled "Behavioral Science Consultation Team, Joint Intelligence Group, Joint Task Force – GTMO, Standard Operating Procedures," Ring Decl. ¶ 5, that was

created to "establish Standard Operating Procedures (SOP) for the daily operation of the

Behavioral Science Consultation Team (BCST)" at Guantanamo Bay, Cuba, Defs.' Mot. Partial

Summ. J. Ex. I-1. JTF-GTMO 52-66 is a "notes page printout," Defs.' Mot. Partial Summ. J. Ex.

I-1 at 4, for "an undated slide presentation titled 'Interrogator Training'" that "was prepared to

explain the legal basis and justifications" for JTF-GTMO's interrogations. Ring Decl. ¶ 5. For

both of these documents, JTF-GTMO states that the exemption meets Exemption 7's threshold

requirement that the records were compiled for "the law enforcement purposes of pursuing a

violation of federal law and a breach of national security." *Id.* ¶ 14. JTF-GTMO further offers

that "the records contain information related to detainee observation protocols and detainee

management strategies," *id.* ¶ 15, such that release of the withheld information could allow

detainees to "better understand how the guard force operates and government strategies for

ensuring the security of detention and interrogation operations, which could be used to evade

those protocols," *id.* ¶ 16. Plaintiffs do not challenge the statement that the information was

compiled for law enforcement purposes, but instead attack JTF-GTMO's justification as

insufficient to satisfy what Exemption 7(E) demands. *See* Pls.' Mem. 40. Plaintiffs contend that

JTF-GTMO has not set forth with adequate particularity "how potential evasion of protocols

would lead to circumvention of the law." *Id.*

Here, even taking into account Exemption 7(E)'s low bar, the Court agrees that JTF-

GTMO's justification is wanting. As this Court concluded in its March 2019 memorandum

opinion with respect to similar language offered by Defendant Navy, *see Bloche II*, 370 F. Supp.

3d at 58, the conclusory language provided does little more than restate the applicable legal

standard. Although JTF-GTMO does mention the "guard force" and "government strategies for

ensuring the security of detention and interrogation operations," it does not include any further

details, such as whether the information pertains to personnel, timing, reliability, or other matters entirely. And this lack of any further information means that the Court can only speculatively connect the dots to determine *how* release of the redaction could create the "chance of a reasonably expected risk" of circumvention of the law. Defendants' arguments to the contrary are unavailing. For instance, Defendants invoke *Rosenberg v. Dep't of Defense*, 342 F. Supp. 3d 62, 94 (D.D.C. 2018), as a recent case that "credit[ed] JTF-GTMO's explanation that 'detainees' improved understanding' of security-related protocols 'could reasonably be expected to 'create a risk of circumvention.'" Defs.' Mem. P. & A. Opp'n 29. But in *Rosenberg*, the redacted information involved a far more specific topic: "the inherently contentious and confrontational topic of enteral feeding of JTF-GTMO detainees." 342 F. Supp. 3d at 94 (internal quotation mark and citation omitted). In this case, JTF-GTMO has not provided the Court with a comparably specific topic at issue in the redacted material. The Court can imagine the topic, to be sure, based on the surrounding text. But the justifications themselves fail to spell it out, and it is the duty of the agency—not the Court—to establish the requisite connection between a law enforcement "individual or incident" and possible security risk or violation of federal law. *Blackwell*, 646 F.3d at 40 (quoting *Campbell*, 164 F.3d at 32).

Accordingly, JTF-GTMO has not carried its burden to establish that it properly withheld information pursuant to Exemption 7(E) in JTF-GTMO 4-16 and JTF-GTMO 52-66.[37] Again, in such a situation, "the district court . . . has several options, including inspecting the

---

[37] The Court recognizes that Exemption 1 was also applied to portions of the document, and may independently protect these limited redactions. But because this exception does not shield the remainder of the redacted portions, and because JTF-GTMO applied Exemption 7(E) to all portions of the document to which it also applied Exemption 1, the Court will address the application of Exemption 1 only if it—upon submission of further supplementary material—concludes that Exemption 7(E) does not properly shield the withheld portions of the challenged documents.

documents *in camera,* requesting further affidavits, or allowing the plaintiff discovery." *Pub. Emps. for Envtl. Responsibility v. Envtl. Prot. Agency*, 213 F. Supp. 3d 1, 16 (D.D.C. 2016) (citing *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 997 (D.C. Cir. 1998)).  Here, particularly since parts of the documents at issue remain classified, the Court finds supplementary justification to be the most appropriate path to resolution.  The Court thus directs Defendant JTF-GTMO to provide updated justifications for its application of FOIA exemptions, either in the form of new declarations or a revised *Vaughn* index, *see Vaughn*, 484 F.2d at 826–28.[38]  After such a submission, Plaintiffs shall confirm that all four documents remain contested, and either or both parties may file renewed motions and/or cross-motions for summary judgment.

## V.  CONCLUSION

For the foregoing reasons, Defendants' renewed motion for partial summary judgment, ECF No. 110, is **GRANTED** with respect to Defendant Navy, **GRANTED** with respect to Defendant OASD-HA Policy 659, OASD-HA Policy 758-59, OASD-HA Policy 761-62, and OASD-HA Policy 765-66 and **DENIED** with respect to OASD-HA Policy 27-35.  Defendants' motion for partial summary judgment, ECF No. 96, is **GRANTED** with respect to all federal Defendants' application of FOIA exemptions other than the application of exemptions in the following documents, for which the motion is **DENIED**: all sixty-nine of the contested documents produced by Defendant Army,[39] SOCOM 8, DIA 12, JTF-GTMO 4-16, JTF-GTMO

---

[38] In this supplementary filing, JTF-GTMO is to: (1) clarify its basis for withholding JTF-GTMO 94-95, or, in the alternative, to explain what other document GTMO 94-95 duplicates, and whether any such document has been released in full or in part; (2) indicate what document on Plaintiffs' Updated History of Disputed Documents, ECF No. 101-1, it refers to in its justification of the material located at Bates numbered pages 0014-0015; and (3) supplement its justifications for withholding information pursuant to Exemption 7(E) to address the issues identified above.

[39] For the following forty-seven documents, summary judgment is denied because the explanation is inadequate, for the reasons specified in this opinion: Army 21, Army 24, Army 25,

52-66, JTF-GTMO 78-90 and JTF-GTMO 94-95.  Plaintiffs' cross-motion for partial summary

judgment, ECF No. 97, is **DENIED**.  An order consistent with this Memorandum Opinion is

separately and contemporaneously issued.


Dated:  October 29, 2019                                    RUDOLPH CONTRERAS
                                                           United States District Judge

---

Army 26, Army 34, Army 40, Army 41, Army 42, Army 43, Army 44, Army 45, Army 47,
Army 48, Army 49, Army 50, Army 51, Army 52, Army 55, Army 56, Army 63, Army 64,
Army 65, Army 66, Army 69, Army 70, Army 73, Army 74, Army 75, Army 76, Army 77,
Army 78, Army 79, Army 86, Army 88, Army 89, Army 90, Army 91, Army 92, Army 93,
Army 94, Army 98, Army 99, Army 107, Army 109, Army 111, Army 112, Army 113.  For the
remaining twenty-two documents, summary judgment is denied due to Army's failure to
establish that it has released all reasonably segregable, non-exempt material.